WEINER, Senior District Judge:
 

 L
 

 The Secretary of the Navy brought this action seeking.a refund of approximately $2 million allegedly overpaid to Southwest Marine Incorporated’s predecessor in interest, Northwest Marine Iron Works (NMIW), for overhaul work completed on the U.S.S. Duluth in 1986. The action was heard initially by the Armed Services Board of Contract Appeals (ASBCA), which entered judgment for Southwest. The Navy filed an appeal with the United States Court of Appeals for the Federal Circuit, which held it had no jurisdiction to hear the case and transferred it to the United States District Court for the Southern District of California.
 
 Dalton v. Southwest Marine, Inc.,
 
 120 F.3d 1249 (Fed.Cir.1997)
 
 (“Dalton
 
 /”). The district court reversed the ASBCA, entered judgment in favor of the Navy and remanded to the ASBCA for computation of damages. Jurisdiction in the district court was premised upon the exception to 41 U.S.C. § 607(g)(1)(b) for marine contracts as discussed by the Federal Circuit in
 
 Dalton I.
 
 
 *1132
 
 Jurisdiction on appeal is premised upon 28 U.S.C. § 1291, but contested by the Secretary, who argues that the order of the district court, remanding the action to the ASBCA, was not a final order. Likewise, Southwest contested the jurisdiction of the district court, arguing that the Secretary had no right of appeal from the initial adverse finding of the ASBCA. We find that although the district court’s remand order was interlocutory, it is immediately appealable under 28 U.S.C. § 1292(a)(3). We also find the district court’s exercise of jurisdiction was proper and that the district court correctly held on the merits that the Navy was entitled to reimbursement. Accordingly, we affirm in all respects.
 

 II.
 

 The underlying facts are not in dispute. The Navy let out the contract to NMIW to overhaul the U.S.S. Duluth in August 1985; the work was completed and the ship redelivered to the Navy in 1986. The contract was a “fixed-price, incentive contract,” which is something of a misnomer since it does not contain a fixed price. Rather it is a cost-plus arrangement, under which the Navy reimburses the contractor for its actual allowable costs, adjusted according to a contractually-defined formula, which 'is limited by a ceiling price. Thus, the actual price of the work is not determined at the time the contract is let. Once final cost is determined, the final price is then determined with a profit to the contractor calculated as the work is performed pursuant to a formula. Prior to determination of the final price, progress payments are made to the contractor, subject to standard clauses allowing for adjustment for over and under payments and a Credits Provision Clause
 
 [3]
 
 , which reduces the amounts chargeable to the Navy in the event of a reduction in contractor costs.
 
 [4]
 
 After redelivery of the ship, NMIW continued to perform various contract responsibilities, such as negotiating the cost of change orders and submitting data necessary to establish the final contract price.
 

 On October 29, 1986, four months after redelivery, NMIW filed a Chapter 11 petition in District of Oregon. The Navy’s contracting officer (CO) for the Duluth and Supervisor of Shipbuilding were both aware of the petition, and the Navy filed claims regarding other work NMIW had performed on other ships. No claim was ever asserted over the work on the Duluth. NMIW’s Second Amended Plan of Reorganization was approved by the bankruptcy court on March 20, 1987. It provided that unsecured claims in excess of $1,000 would be converted into interest bearing debentures of the reorganized company in a principal amount equal to the allowed unsecured claim, and for the repayment of that principal out of the reorganized company’s net income.
 

 In April 1987, one month after confirmation of the plan, NMIW submitted forms to the Navy identifying final contract costs of $25,098,862 on the Duluth. On December 21, 1988, the Navy agreed to settle NMIW’s claims. On April 3, 1989, the CO executed a modification increasing the ceiling price to $23,295,752. Thereafter, NMIW submitted an invoice to the Navy claiming payment of $2,811,077, i.e. the new ceiling price less all prior progress payments and the agreed upon sum to be retained for closeout. The CO approved the invoice the next day.
 

 Meanwhile, in the interim period between when NMIW submitted its final cost calculation and the date the CO approved the new the ceiling price, NMIW signed a letter of agreement with Southwest which
 
 *1133
 
 agreed to acquire NMIW’s outstanding stock. The February 28, 1989 acquisition agreement was conditioned upon NMIW receiving specific debt concessions from its secured creditors and the debenture holders. The stock purchase was completed on April 17, 1989; a few days later the bankruptcy court issued a Chapter 11 Final Report memorializing the concessions of the creditors. The Navy asserts that, at the time it established the final audit of costs and rates under which NMIW would be compensated for those costs, it had no knowledge of the pending stock purchase agreement and creditor concessions.
 

 By letter of April 21, 1989, the Navy notified NMIW that it had learned that at least one of the company’s creditors had agreed to forgive some indebtedness, and was considering a recoupment action for fees it had paid the contractor, and for which NMIW was no longer obligated to pay out as costs to others. NMIW maintained that the Navy had no right to participate in a compromise of debts occurring in conjunction with bankruptcy proceedings. On May 11,1994, after several years of unsuccessful negotiations, the CO issued a final decision holding that the Navy had overpaid NMIW $2,161,287. The CO determined that debt concessions fell within the meaning of the Credits Provision Clause.
 

 Southwest appealed the CO’s decision to the ASBCA pursuant to the Contract Disputes Act (CDA), 41 U.S.C. § 607(d).
 
 [5]
 
 The Board decided the case on cross motions for summary judgment. The Navy contended that it was entitled to judgment because (1) the Credits Provision Clause, the Incentive Price Revision (IPR) clause of the contract, and the common law, all authorize recovery of overpayments; and (2) Southwest was estopped from contesting recovery because, had the Navy been told of the creditor concessions prior to establishing the final costs, it would have calculated the net amount owed to NMIW differently.
 

 The Board disagreed, holding that forgiveness of the debentures received under the reorganization plan could not be considered an overpayment by the Navy under the fixed-price incentive contract.
 
 [6]
 
 Applying bankruptcy law principles, the ASBCA decision reasoned that a discharge in bankruptcy does not extinguish or cancel pre-confirmation debts. Rather it merely releases the debtor from personal liability for such debts, because the discharge operates as an injunction against post-confirmation action to collect pre-con-firmation debts. The bankruptcy court’s confirmation of the plan therefore enjoined NMIW’s creditors from collecting debts related to the work on the Duluth, but did not extinguish those debts. The Board concluded that were the Navy to recoup as an overpayment monies never paid by NMIW for subcontractor costs because the subcontractors cannot now collect those costs from NMIW, the Navy would obtain a significant benefit from NMIW’s bankruptcy discharge: i.e. the receipt of subcontractor materials and labor for no cost. Accordingly, the Board held that the Navy cannot equate the subcontractor’s post-confirmation decision to compromise the debentures they obtained under the reorganization plan with an “overpayment” to NMIW on the Duluth contract.
 

 Instead, the Board granted the cross motion of Southwest which argued that once a contractor performs the contract and incurs costs, payment is due without regard to whether the contractor has actually paid his suppliers or may have payment disputes with them. Finding that the contract included a provision requiring
 
 *1134
 
 the Navy to make progress payments, computed as a percentage of total costs incurred whether or not actually paid, the Board concluded that the Navy was not authorized to recoup progress payments based upon a failure to pay debts owed to subcontractors or others. The Board also rejected the Navy’s argument that, under the Credits Provision Clause, Southwest was required to credit the government if it simultaneously, or subsequently recovered a portion of the same costs billed to the Navy from another source. Again the Board, relying on bankruptcy law principles, found that NMIW’s discharge did not amount to a recovery of the same costs from another source because the pre-con-firmation debt continued to exist, albeit uncollectible from the debtor.
 

 Following the Navy’s appeal to the Federal Circuit, and that court’s transfer of the appeal to the district court in August 1997, the Navy took no action to prosecute the appeal for six months, leading to the filing by Southwest of a motion to dismiss for want of prosecution. The motion was denied by the district court by order of April 6, 1998. It found that the delay was not unreasonable because the Navy made a good faith effort to inquire into whether the ease was actually transferred and received incorrect information from the district court clerk’s office. It was not notified of the transfer until October 27, 1997. The court also refused to find that the passage of time between the Navy’s initial claim for reimbursement in 1989 and the CO’s decision in 1994 should preclude the Navy from appealing the Board decision.
 

 Thereafter the district court issued an order and two amended orders “granting appellant’s appeal.” Only the second amended order, which the district court specifically said was not a final order, is before us on appeal.
 
 [7]
 
 In that order, the version before us on appeal, the district court determined that it had jurisdiction over the appeal, rejecting Southwest’s argument that the CDA does not authorize agency appeals from an adverse Board decision in maritime cases. On the merits, the district court held that the Board erroneously focused upon NMIW’s pre-petition debts, rather than on how the voluntary post-petition activities of NMIW’s creditors, i.e. their compromising of the debentures, affected NMIW’s 1989 representations concerning its entitlement to cost reimbursement under the contract. In other words, the issue which should have been addressed by the Board was not the bankruptcy law question of whether the pre-petition debts were collectible, but rather the government contract law question of how the post-petition agreement for creditor concessions affected the Navy’s ability to recoup its progress payments.
 

 Having found that the Board misapplied bankruptcy law to preclude recoupment, the district court went on to conclude that the Board also erred in determining that the Navy could not recover its overpay-ménts under the contract based on the voluntary post-petition debt concessions. It found, without engaging in any further analysis, that the Navy was entitled to reimbursement under the Credit Provision Clause and the IPR Clause.
 

 In granting in part and denying in part Southwest’s motion for reconsideration which led the issuance of the second amended order, the district court specifically declined to amend the prior order to designate it as.a final order. It stated:
 

 
 *1135
 
 ... the Court declines [t]he request to designate the order as final. First the Court notes that SWM fails to establish that the Court’s refusal to add this language amounts to clear error or that it required for any other ground presented in a proper Rule 59(e) motion. Second, the Court finds that the order speaks for itself; the order remands this case to the ASBCA for further proceedings. The Court is not persuaded that SWM’s interest in attempting to appeal this issue justifies impeding the natural course of this litigation, i.e. a remand for a determination of quantum.
 

 This appeal followed.
 

 III.
 

 The standard of review of an appeal from the ASBCA is provided by statute. Under 41 U.S.C. § 609(b), in an appeal by either the contractor or the government, “notwithstanding any contract provision, regulation, or rules of law to the contrary, the decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.”
 

 IV.
 

 We address first the issue of our own jurisdiction. The Navy argues the district court’s order was not final nor certified as a controlling question of law immediately appealable under 28 U.S.C. § 1292(b). It asserts that, in general, orders which grant partial summary judgment as to liability but leave open the question of damages are by their nature interlocutory under Fed.R.Civ.P. 56(c); it adds that in the specific context of a government contracts case, an ASBCA decision in a bifurcated action, addressing only entitlement and not quantum, is not a final order subject to appeal. In response, Southwest argues that, since the district court was sitting as a court of admiralty, its order, even if interlocutory, is appealable under 28 U.S.C. § 1292(a)(3). That section permits appeals of “[ijnterlocutory decrees ... determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.” We agree that jurisdiction is provided by § 1292(a)(3).
 

 In its decision, the Federal Circuit determined that there was no dispute that the contract involved in this case was wholly maritime.
 
 Dalton I,
 
 120 F.3d at 1250;
 
 see also Southwest Marine of San Francisco, Inc. v. United States,
 
 896 F.2d 532, 533 (Fed.Cir.1990)
 
 (“San Francisco
 
 ”),
 
 citing New Bedford Dry Dock Co. v. Purdy,
 
 258 U.S. 96, 99, 42 S.Ct. 243, 66 L.Ed. 482 (1922) (a contract for ship repairs is a maritime contract; one for original con struction is not). From this premise, the Federal Circuit determined that the case must be transferred because it had no appellate jurisdiction under the CDA over a case involving a maritime contract.
 
 Dalton I,
 
 120 F.3d at 1251-52. The conclusion that the Duluth repair contract is a maritime contract is the law of the case
 
 [8]
 
 and 28
 
 *1136
 
 U.S.C. § 1292(a)(3) applies to supply jurisdiction over what is unquestionably an otherwise unappealable interlocutory order.
 

 We have previously held that § 1292(a)(3) is an exception to the final judgment rule and, therefore, is construed narrowly.
 
 Seattle-First National Bank v. Bluewater Partnership,
 
 772 F.2d 565, 568 (9th Cir.1985). It permits appeals only when the order appealed from determines the rights and liabilities of the parties.
 
 Id.; Arkin v. White Cloud Charter Boat Co., Inc. (In re White Cloud Charter Boat Co., Inc.),
 
 813 F.2d 1513, 1515 (9th Cir.1987). The purpose of the provision is to allow a party found liable in admiralty proceedings to take an immediate appeal without submitting to a protracted trial of the damage issues.
 
 In re Complaint of Nautilus Motor Tanker Co., Ltd.,
 
 85 F.3d 105, 110 n. 3 (3rd Cir.1996);
 
 Slatton v. Martin K. Eby Construction Co., Inc.,
 
 491 F.2d 707, 708 (8th Cir.1974). We have held that even an entry of partial sum mary judgment can be the subject of an interlocutory maritime appeal so long as the requirement that the order appealed determined the rights and liabilities of the parties is satisfied.
 
 Kesselring v. F/T Arctic Fero,
 
 30 F.3d 1123, 1125 (9th Cir.1994) (where district court’s determination that certain crewmen held preferred wage liens on equipment eliminated any possibility
 
 of
 
 recovery by equipment owner, owner’s rights were actually determined and interlocutory appeal was permissible.)
 

 Here, the district court order unquestionably determined the rights and liabilities of Southwest. It found as a matter of government contract law that the Navy could not be barred from recovering its overpayments and that it was entitled to reimbursement. It remanded to the Board only for a calculation of quantum. As the Board was given no further opportunity to adjudicate the Navy’s entitlement, Southwest’s liability to make reimbursement was settled. Under § 1292(a)(3), the district court’s order is thus appealable.
 

 V.
 

 Southwest next argues that the district court improperly exercised jurisdiction in deciding the Navy’s appeal because under the CDA the Navy has no right of appeal from ASBCA decisions on maritime contracts. Seizing upon language in the Federal Circuit’s decision in
 
 San Francisco,
 
 that “Congress in enacting the Contract Disputes Act of 1978 assured that no change was made in the existing appellate path of disputes involving maritime contracts”, 896 F.2d at 534, Southwest argues that, since pre-CDA the Navy had no right of appeal to the courts from an adverse Board decision absent fraud, the district court had no jurisdiction to hear the appeal.
 
 See S & E Contractors, Inc. v. United States,
 
 406 U.S. 1, 19, 92 S.Ct. 1411, 1421, 31 L.Ed.2d 658 (1972); Coburn,
 
 The Contract Disputes Act of 1978,
 
 (New York 1982) ¶. 2-5. Southwest’s argument misreads the holding of
 
 San Francisco
 
 and ignores specific provisions in the CDA permitting the government to file appeals of adverse determinations. The court’s use of the phrase “appellate path” was a reference to jurisdiction, not the substantive question of whether a party enjoys the right of appeal.
 

 San Francisco
 
 was concerned only with the jurisdictional question of where appeals from agency contract boards of appeal involving maritime contracts must be brought. It did not address the question of whether the CDA permits appeals by the government. In that case, the Federal Circuit, determined that jurisdiction over matters arising in admiralty, including maritime contracts, was unaffected by the passage of the CDA because, (1) prior to its passage, such jurisdiction was traditionally vested in the district courts,
 
 Id.,
 
 896 F.2d at 534 (“Jurisdiction over matters arising in admiralty, including maritime contracts, has traditionally been with the federal district courts.”); and (2) during its consideration of the CDA, Congress made clear that such jurisdiction was intended to
 
 *1137
 
 be maintained.
 
 Id.
 
 quoting 124 Cong.Rec. 36267 (1978) (“The legislative report defined very precisely that the current jurisdiction for Maritime Contract claims is to be maintained and not changed by [the CDA].”). The court concluded “[t]hus Congress in enacting the Contract Disputes Act of 1978 assured that no change was made in the existing appellate path of disputes involving maritime contracts.”'
 
 San Francisco,
 
 896 F.2d at 534. The court likewise found that in forming the Federal Circuit, Congress again did not change the appellate path of maritime contract disputes since “[njothing in the history of the Federal Courts Improvement Act suggests any congressional intent to reconsider its jurisdictional decision as to maritime contracts.”
 
 Id.
 
 at 535.
 

 The Federal Circuit’s conclusion, that passage of the CDA did not change the way in which maritime contract cases are to be brought, does not establish that the substantive provisions of CDA, granting the Navy the right to appeal adverse decisions, do not apply to maritime contract cases. As the Federal Circuit has already held in this case, “[n]othing in section 603 of the Contract Disputes Act excludes maritime contracts from the purview of the Contract Disputes Act.”
 
 Dalton I,
 
 120 F.3d at 1251. The only caveat to this proposition is that, in enacting 41 U.S.C. § 603, Congress specifically provided that appeals from agency boards of contract appeals under § 607 and judicial review under § 609 arising out of maritime contracts, shall be governed by chapter 20 or 22 of Title 46 as applicable,
 
 to the extent that those chapters are not inconsistent with this
 
 chapter,
 
 [9]
 
 Because Chapters 20 and 22 apply to maritime contracts only if consistent with the CDA, the provisions of the CDA necessarily supercede those chapters if they are inconsistent. Thus, it is irrelevant that pre-CDA law did not provide for appeals by the government.
 

 In addition, there are at least two other sections of the CDA which support the conclusion that agencies as well as contractors may appeal decisions from contract boards of appeal. Section 607(g)(1)(B) specifically provides that the agency head may, with the approval of the Attorney General, seek judicial review in the Federal Circuit; § 609 provides that in the event of such appeal under § 607 “by a contractor
 
 or the Government
 
 ” questions of law shall be reviewed de novo, while questions of fact shall be final and conclusive.
 

 Thus, the statutory scheme of §§ 603, 607 and 609 provides (1) for appellate jurisdiction in the district courts for maritime contract suits; (2) for appellate jurisdiction in the Federal Circuit for all other appeals from ASBCA rulings; and (3) an otherwise uniform rale that either contractors or agency heads may seek judicial review of adverse decisions. Accordingly, the district court’s exercise of appellate jurisdiction over this maritime contract suit was proper.
 

 VI.
 

 Southwest next argues that the district court abused its discretion
 
 [10]
 
 when it declined to dismiss the appeal for
 
 *1138
 
 want of jurisdiction because the court ignored Local Rule 41.1 which provides:
 

 Actions or proceedings which have been pending in this court for more than six months, without any proceeding or discovery having been taken therein during such period, may, after notice, be dismissed by the court for want of prosecution, at the calling .of a calendar prepared for that purpose by the clerk. Suph a dismissal shall be without prejudice, unless otherwise ordered.
 

 In ruling on the motion, the district court held
 

 The Court agrees with the Navy that SWM. has not demonstrated unreasonable delay on the Navy’s part. Although CivLR 41.1 creates a presumption of unreasonable delay after six months of inaction, the Court notes that the decision to dismiss under CivLR 41.1 is discretionary and the Court declines to exercise its discretion i... First, the Court notes that the Navy apparently made a good faith effort to inquire into the status of the case after the Federal Circuit transferred the action. Due to a miscommunication with the Clerk’s Office, however, the Navy was not informed of the transfer until October 27, 1997.... The’ Court finds that, under the circumstances, the Navy has not unreasonably delayed in pursuing this action. Additionally, the Court finds that SWM has failed to demonstrate actual prejudice.
 

 Southwest asserts that it did not have to demonstrate that the Navy’s delay was unreasonable or that it suffered actual prejudice and the district court’s requiring it to do so was an abuse of discretion. This argument lacks merit.
 

 In
 
 Moneymaker v. CoBen (In re Eisen),
 
 31 F.3d 1447, 1451 (9th Cir.1994), we held that we require the district court to weigh five factors to determine whether to dismiss a case for lack of prosecution: “(1) the public’s interest in expeditious resolution of litigation; (2) the court’s need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions.” More specifically, on the issue of prejudice, we stated that
 

 the failure to prosecute diligently is sufficient by itself to justify a dismissal, even in the absence of a showing of actual prejudice to the defendant from the failure_ The law presumes injury from unreasonable delay. However, this presumption of prejudice is a rebut-table one and if there is a showing that no actual prejudice occurred, that factor should be considered when determining whether the trial'court exercised sound discretion.
 

 Id.
 
 at 1452-53
 
 citing Anderson v. Air West, Inc.,
 
 542 F.2d 522, 524 (9th Cir.1976). Thus, Southwest’s assertion that it did not have to demonstrate unreasonable delay or that it suffered actual prejudice is inaccurate. Unreasonable delay is the foundation upon which a court may presume prejudice. Its failure to show the delay was unreasonable made the presumption of. prejudice rebuttable and, in turn, made Southwest’s failure to’ show actual prejudice a propér basis for the district court’s denial of the motion. •
 

 VII.
 

 Southwest next argues, that even if the district court had jurisdiction to reverse the summary judgment in its favor, its decision, while sitting as a court of appeal, to grant summary judgment to the Navy, was improper since it made no finding that there were no genuine issues of disputed fact. This argument also bears little weight. What Southwest describes as disputed factual contentions are actually disputed legal contentions which the district court rightfully decided.
 

 Southwest identifies two allegedly disputed facts upon which the district court relied: (1) the Navy’s factual contention that NMIW accepted progress payments without actually paying the subcontractors for their costs; and (2) the Navy’s factual contentions that post-petition obligations
 
 *1139
 
 replaced the original pre-petition ones and that NMIW sought reimbursement on these costs to the subcontractors when it certified, post-petition the April 5, 1989 invoice. As proof that the district court relied on these disputed issues of fact, Southwest directs our attention to the court’s statement that “the Navy correctly focuses on the voluntary post-petition activities of NMIW’s creditors and how these activities affect NMIW’s 1989 representations.” None of these excerpts indicate that disputed issues of fact were present precluding entry of summary judgment for the Navy on the liability (entitlement) issue.
 

 Whether NMIW accepted progress payments without paying the subcontractors was not in dispute. The record before the district court included the entire history of the Navy’s payments to NMIW as found by the ASBCA.
 
 [11]
 
 The district court was also within its bounds to infer from the record that the subcontractors were not paid in full for their work on the Duluth. The record included the undisputed fact that the plan of reorganization awarded unpaid subcontractors debentures in place of their pre-petition claims. If they had been paid in full, there would have been no debentures issued for unpaid bills on the Duluth project. Thus there appears to be no genuine issue that NMIW received progress payments but did not fully pay the subcontractors and Southwest identifies nothing in the record to indicate otherwise.
 

 The Navy’s alleged factual contentions that post-petition obligations replaced the original pre-petition ones were not factual contentions at all. Rather they were a subpart of its legal argument that, whether or not the pre-petition debts were extinguished by the reorganization, the Navy’s efforts to recover costs related only to the creditor’s voluntary surrender of their debentures, and thus bankruptcy law was not implicated in the issue of whether the Navy was entitled under the contract to share in those cost reductions. Finally, the Navy’s contention that NMIW sought reimbursement on the entirety of the costs, even though it knew they would be compromised by the subcontractors’ acceptance of the reorganization plan, was also not genuinely disputed. The ASBCA found that NMIW forwarded the invoices to the Navy on April 5, 1989 without making any mention of the stock purchase agreement between NMIW and Southwest, which was conditioned upon the debentures being compromised.
 

 VIII.
 

 Arriving at long last at the main substantive issue in this appeal, we believe it can be stated succinctly: Does bankruptcy law trump government contract law and prevent the Navy from recouping its overpayment to NMIW? The district court correctly held that the answer to this question is no.
 

 The ASBCA concluded, applying bankruptcy law principles, that the Navy may not take advantage of the subcontractors’ forgiveness of the debentures received under the reorganization plan. It reasoned that the subcontractor’s compromise of the debentures could not constitute a forgiveness, rebate or credit of the Duluth contract costs under the Credits Provision Clause because the inability of the creditors to collect their pre-confirmation Duluth claims was due to the bankruptcy discharge and not any voluntary action on their parts. As the debentures replaced those pre-confirmation claims, the Board concluded their post-confirmation compromise as part of the acquisition agreement likewise could not inure to the Navy’s benefit. The basis for this reasoning is not supported by the record. The record clearly showed that the claimed reduction in Duluth contract costs was based not on NMIW’s bankruptcy discharge or the debenture holders’ inability to collect their
 
 *1140
 
 pre-confirmation claims, but rather on the debenture holders’ subsequent decisions, some two years after the plan confirmation, to compromise their post-confirmation claims — the debentures — as part of the NMIW/Southwest merger. Thus, the proper analysis must focus upon what effect, if any, bankruptcy law provisions have upon post-confirmation acts which compromise post-confirmation claims.
 

 Confirmation not only discharges the debtor from its pre-confirmation debts, it also revests all of the property of the estate back in the debtor, and all the property dealt with in the plan is revested free of all claims and interests of the creditors, 11 U.S.C. § 1141(b)-(d). Importantly, while the plan binds pre-confirmation creditors, it does not bind post-confirmation creditors.
 
 See
 
 8 Collier on Bankruptcy, ¶ 1141.02[1] (15th Rev. ed.2000);
 
 Holywell Corp. v. Smith,
 
 503 U.S. 47, 53-54, 112 S.Ct. 1021, 1025, 117 L.Ed.2d 196 (1992) (trustee appointed under plan-established trust liable for post-confirmation taxes because binding nature of the confirmed plan reaches only preconfirmation obligations);
 
 see also Shure v. State of Vermont (In re Sure-Snap Corp.),
 
 983 F.2d 1015 (11th Cir.1993) (confirmation discharged pre-confirmation liabilities only; debtor not protected from post-confirmation creditor for debt arising from voluntary post-confirmation activity related to asset that was formerly part of estate). As we stated in a different context, once the bankruptcy court confirms a plan of reorganization, the debtor is free to go about its business without further supervision or- approval of the count, and concomitantly, without further protection of the court.
 
 Hillis Motors, Inc. v. Hawaii Automobile Dealers’ Ass’n,
 
 997 F.2d 581, 589 (9th Cir.1993),
 
 citing Pettibone Corp. v. Easley,
 
 935 F.2d 120, 122 (7th Cir.1991). The court in
 
 Pettibone
 
 noted that, “[fjormerly a ward of the court, the debtor is emancipated by the plan of reorganization. A firm that has emerged from bankruptcy is just like any other defendant in a tort case: it must protect its interests in the way provided by the applicable non-bankruptcy law....”
 
 Id. See also Norwest Equipment Finance, Inc. v. Nath (In re D & P Partnership),
 
 91 F.3d 1072, 1074 (8th Cir.1996) (generally, once the plan has been confirmed, the estate of the debtor and the bankruptcy court’s jurisdiction ceases to exists). As the Navy’s claim against NMIW/Southwest for re-coupment of the overpayment arose out of the debenture holder’s post-confirmation decisions to compromise their post-confirmation claims, it was error for the ASBCA to equate the debentures with the debenture holder’s pre-confirmation claims.
 

 As the district court concluded, the correct focus should have been upon how the debenture holders’ voluntary relinquishment of their rights affected NMIW’s claim for costs on the Duluth project, a question wholly distinct from the operation of the bankruptcy discharge. Once the bankruptcy law aspect of the case is disposed of, the Navy’s right to recoupment under straightforward government contracting law becomes clear. Under the Credits Provision Clause, Southwest was required to credit back to the Navy any income, rebate, allowance or other credit related to an allowable cost, which was received by or accrued to the contractor. The debenture holder’s agreement to forego collection of the debentures satisfied this definition. It was related to the claimed cost — there would have been no debentures had NMIW actually paid its subcontractors for the Duluth work — and it accrued to the contractor since Southwest no longer had to pay them their full principle. Accordingly, the contracting officer’s final decision that the debenture concessions fell within the meaning of the Credits Provision Clause was correct, the ASBCA’s application of bankruptcy law was error, and the district court conclusion that the Navy was entitled to reimbursement was correct.
 

 AFFIRMED.
 

 [3]
 

 . The Credits Provision Clause provides:
 

 The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund.
 

 [4]
 

 . The initial contract provided for a target cost of $12,282,010 and a ceiling price of $15,966,613. However, over the course of the work, the parties executed over 200 change orders, many of which altered the target cost and ceiling price.
 

 [5]
 

 . The section provides:
 

 Each agency board shall have jurisdiction to decide any appeal from a decision of a contracting officer (1) relative to a contract made by its agency.... In exercising this jurisdiction, the agency board is authorized to grant any relief that would be available to a litigant asserting a contract claim in the United States Court of Federal Claims.
 

 [6]
 

 . The Board noted that, as the parties had never agreed upon a total final cost and final contract price, the case had to be analyzed on whether the Navy was entitled to the return of the progress payments.
 

 [7]
 

 . The first order, dated August 20, 1998, granted the Navy's appeal and reversed the ASBCA. The court found that Southwest owed the Navy the $2,161,287 overpayment, but remanded for further proceedings so that the ASBCA could make any necessary modifications to the $2,161,287 figure, such as for interest. An .amended order issued one week later, but made no material changes to the district court's conclusions. A second amended order issued on October 1, 1998 in response to a motion by Southwest seeking reconsideration. The. district court granted the motion for reconsideration in part, striking the amount of $2,161,287, and remanding to the ASBCA for calculation of quantum. In the argot of the ASBCA, cases are bifurcated into entitlement and quantum phases, rather than liability and damages.
 

 [8]
 

 . "Law of the case is a jurisprudential doctrine under which an appellate court does not reconsider matters resolved on a prior appeal. 'The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case.’ "
 
 Jeffries v. Wood,
 
 114 F.3d 1484, 1488-89 (9th Cir.1997) (en banc)
 
 quoting Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.),
 
 77 F.3d 278, 281 (9th Cir.1996). While the prior appeal in this case was to the Federal Circuit, the doctrine should apply nonetheless. We have held that the doctrine is discretionary and not mandatory, merely expressing the practice of courts generally to refuse to reopen what has been decided and that a "prior decision should be followed unless: ‘(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.’”
 
 Jeffries,
 
 114 F.3d at 1489,
 
 quoting Rainbow,
 
 77 F.3d at 281. As none of these three factors is present, we see no reason to reopen the conclusion reached by the Federal Circuit that this was a maritime contract.
 

 [9]
 

 . Chapter 20 of Title 46 concerns suits in admiralty by or against vessels or cargoes of the United States; Chapter 22 concerns suits in admiralty against the United States for damages caused by public vessels. The Federal Circuit has held that while § 603 does not mention suits against the United States in contract, the legislative history left no doubt that Congress intended that section 603 cover such suits:
 

 This jurisdictional decision [that maritime contract cases remain in the district courts], albeit made by Congress, was imperfectly embodied in section 603, for section 603 refers to Chapter 20 ... [and] Chapter 22 ... and is silent as to the issue before Congress,
 
 viz.,
 
 suits against the United States in contract. However, the legislative history leaves no doubt that Congress intended, through section 603, to cover such suits.
 

 San Francisco,
 
 896 F.2d at 534.
 

 [10]
 

 . A district court’s decision on a motion to dismiss an action for lack of prosecution is reviewed for an abuse of discretion.
 
 Hernandez v. City of El Monte,
 
 138 F.3d 393, 398 (9th Cir.1998).
 

 [11]
 

 . Under the CD A, the district court was required to accept the facts as found by the ASBCA as final and conclusive unless fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such findings are not supported by substantial evidence. 41 U.S.C. § 609(b).