**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: Douglas Ray,
                        *Debtor.*

Battle Ground Plaza, LLC,
                        *Appellant,*

v.

Douglas Ray; Estate of Irwin
Jessen; Dean Maldonado,
                        *Appellees.*

No. 09-60005

BAP No.
WW-08-1104-
KaJuPa

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Pappas, Jury, and Kaufman, Bankruptcy Judges, Presiding

Argued and Submitted
August 31, 2010—Seattle, Washington

Filed October 25, 2010

Before: Michael Daly Hawkins, M. Margaret McKeown and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Hawkins

17467

---

**COUNSEL**

Ben Shafton, Caron, Colven, Robison & Shafton, Vancouver, Washington, for the appellant.

Russell D. Garrett and Todd A. Mitchell, Bullivant Houser Bailey PC, Vancouver, Washington, for the appellees.

---

**OPINION**

HAWKINS, Senior Circuit Judge:

On an issue of first impression, we examine whether a bankruptcy court retains jurisdiction over a collateral attack—based on a state breach of contract theory—on its previous sale order, having already approved a Chapter 11 Plan, including the sale of real property, closed the case, overseen payment of creditors, and discharged the debtor. Determining that the bankruptcy court lacked jurisdiction, we reverse the Bankruptcy Appellate Panel ("BAP") and remand with

instructions to vacate the bankruptcy court's judgment for lack of jurisdiction.

## I.  BACKGROUND

### A.  Factual Background

Douglas M. Ray (the "Debtor") filed a Chapter 11 petition on August 10, 2005. At that time, the Debtor and Irwin P. Jessen ("Jessen") were co-owners of commercial real estate consisting of a shopping center commonly known as the Battle Ground Plaza Shopping Mall ("Battle Ground Mall").

In December 2000, the Debtor and Jessen (together the "Sellers") entered into a purchase and sale agreement (the "Battle Ground Mall Agreement") with Battle Ground Plaza, LLC ("BG Plaza") for the sale of the Battle Ground Mall.[1] The Agreement gave BG Plaza a right of first refusal for an undeveloped, one-half acre adjoining parcel (the "½-Acre Parcel") also owned by the Sellers.

The bankruptcy court confirmed the Third Amended Plan of Reorganization (the "Plan") on March 7, 2002. The Plan referenced the Debtor's sale of the Battle Ground Mall to BG Plaza, but noted the sale had yet to close due to discovery of "adverse environmental conditions." The Plan also expressed the Debtor's intention to sell his interest in the ½-Acre Parcel, either to BG Plaza pursuant to its first refusal rights, to his partner Jessen, or to another party altogether.

Subsequently, the Sellers decided to jointly convey their interest in the ½-Acre Parcel. On May 18, 2005, Dean Maldonado ("Maldonado") signed and tendered a purchase and sale agreement (the "Maldonado Agreement") for the ½-Acre Parcel. The Maldonado Agreement included language making

---

[1]The agreement was actually with BG Plaza's predecessor in interest, Bruce Feldman, Inc., an immaterial fact on appeal.

Maldonado's duty to close the transaction contingent on his review of any "cross parking agreements," i.e., any agreements that may have existed providing the ½-Acre Parcel the right to use the Battle Ground Mall's parking lot and vice versa.

Following the Maldonado Agreement, Jessen's attorney sent a letter to BG Plaza, notifying it of the Sellers' intended sale of the ½-Acre Parcel. Rather than exercising or declining its first refusal rights, BG Plaza claimed its rights were "not ripe until the underlying sale [of the Battle Ground Mall] is closed."

The Sellers responded in turn by executing the Maldonado Agreement. The Debtor then moved the bankruptcy court to approve the sale, which it did in a July 5, 2005 order, pursuant to 11 U.S.C. § 363. BG Plaza, which received notice of the proposed sale, did not object to or appeal this Sale Order, though, in any event, the ½-Acre Parcel was not ultimately sold pursuant to it.

In August 2005, Jessen's counsel prepared a Reciprocal Easement Agreement ("the Easement") and sent copies to the Debtor's attorney, the Sellers' real estate agent, and Maldonado. The Easement created valuable cross parking rights for the ½-Acre Parcel in the existing parking areas of the Battle Ground Mall. The parties did not execute the Easement agreement at this time, nor is there evidence the Sellers brought the Easement to BG Plaza's attention.

During a pre-closing due diligence survey of the ½-Acre Parcel, Maldonado discovered a sewer pipe requiring removal. The parties subsequently agreed to a reduction of the purchase price and an extension of closing until November 15. Notified of the new purchase price, BG Plaza gave notice of its intent to exercise its first refusal rights, providing a $5,000 promissory note, stating principal and interest would be payable by December 19, 2005.

Shortly thereafter, the Debtor moved the bankruptcy court (with notice to BG Plaza) to approve the sale of the ½-Acre Parcel to Maldonado.

BG Plaza promptly took two actions. First, it filed a motion objecting to the proposed sale, asserting it violated the conditions of its first refusal rights. Second, it requested copies of "all parking agreements" that Maldonado had previously requested from the Sellers pursuant to the Maldonado Agreement. Sellers did not answer this request, apparently concluding that BG Plaza, having responded to the terms of the Maldonado Agreement with a promissory note containing materially different terms, no longer had an "interest in the property and had no reason to have a copy" of the parking agreements.

Following a hearing,[2] the bankruptcy court approved the sale of the ½-Acre Parcel to Maldonado "free and clear of all liens and encumbrances . . . including but not limited to the right of first refusal granted to [BG Plaza]." The bankruptcy court found BG Plaza's attempted exercise of its right of first refusal failed to mirror the Maldonado Agreement, because it allowed until December 19 to determine whether to even proceed with the purchase and proposed an extension of the closing. Subsequently, the bankruptcy court denied BG Plaza's motion for reconsideration. BG Plaza failed to either appeal the sale order or seek a stay necessary to prevent a direct appeal from becoming moot. *See* 11 U.S.C. § 363(m).

Sellers and Maldonado then executed the Easement, and the Sellers conveyed the ½-Acre Parcel by statutory warranty deed to an assignee of Maldonado. The Debtor's share of the sale enabled him to pay the remaining creditors under the Plan, and, on December 29, 2005, the bankruptcy court issued a Final Decree closing the Chapter 11 Case.

---

[2]BG Plaza received notice of the hearing and filed an objection to the approval of the sale to Maldonado.

Some six months later, Maldonado sought approval to construct a commercial development on the ½-Acre Parcel, which resulted in BG Plaza obtaining a copy of the Easement—it claims for the first time—after Maldonado sought municipal site plan approval.

## B.   Procedural History

Claiming it only just discovered the Easement, BG Plaza commenced a lawsuit in Clark County Superior Court (the "state court action") against the Debtor, Jessen, Maldonado, and Maldonado's successor entities, alleging breach of its first refusal rights, and seeking specific performance as well as damages and declaratory relief. BG Plaza primarily alleged the Sellers failed to advise BG Plaza of the Sellers' intent to execute the Easement.

Rather than determine the res judicata effect of the Sale Order, the state court thought it appropriate to "remand" the action to the bankruptcy court, pending the bankruptcy court's determination that it retained jurisdiction.

Thus, on the Debtor's motion and over BG Plaza's objection, the bankruptcy court reopened the Debtor's case in January 2007. At a hearing on the bankruptcy court's jurisdiction, the court noted that it was "very reluctant . . . to assert jurisdiction," but concluded that if it declined to do so, BG Plaza would be unable to obtain specific performance of its first refusal rights without invalidating the court's Sale Order. Therefore, the bankruptcy court entered an order retaining jurisdiction over the breach of contract claims.

Jessen's estate—he had now passed away[3]—sought summary judgment, claiming no disputed facts could show Jessen and the Debtor had failed to provide BG Plaza with sufficient

---

[3]Since Jessen's estate notes that it continues to refer to itself as "Jessen" in its briefs "for convenience," we do the same.

notice of all conditions on which they would have sold the ½-Acre Parcel to Maldonado. The bankruptcy court granted summary judgment, reasoning that its previous orders approving the sale were final and not subject to collateral attack by BG Plaza in state court, and, in any event, the Sellers complied with the terms of the right of first refusal. After the bankruptcy court denied its motion to reconsider, BG Plaza appealed to the BAP.

On December 31, 2008, the BAP affirmed the bankruptcy court's finding of jurisdiction in a Memorandum disposition. BG Plaza timely appealed.

## II.   STANDARD OF REVIEW

Review of the bankruptcy court's finding that it had jurisdiction is de novo. *Piombo Corp. v. Castlerock Props.* (*In re Castlerock Props.*), 781 F.2d 159, 161 (9th Cir. 1986).

## III.   DISCUSSION

In determining the scope of a bankruptcy court's jurisdiction, our analysis begins with the statutory scheme because the "jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995).

[1] Two statutes, 28 U.S.C. §§ 157(a) and 1334,[4] allow district courts to refer proceedings arising in, arising under, or related to the Bankruptcy Code, to bankruptcy courts. With some limited exceptions not at issue here, Section 1334 provides that bankruptcy courts have "jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." § 1334(b); *see generally Collier on Bankruptcy* §§ 3.01-3.03 (Alan N. Resnick & Henry J. Sommer

---

[4]All statutory provisions cited in this Opinion refer to Title 28 of the United States Code, unless otherwise stated.

eds., 16th ed. 2010). Section 157(b)(1) provides that "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11" that are referred to it by the district court. Congress also provided a non-exhaustive list of core proceedings, *see* § 157(b)(2), and indicated a matter may be a core proceeding even if state law may affect its outcome, *see* § 157(b)(3); *see also Marshall v. Stern* (*In re Marshall*), 600 F.3d 1037, 1054 (9th Cir. 2010).

**[2]** The result is that bankruptcy courts have jurisdiction to hear a broad array of issues, but the exercise of their jurisdiction to enter any final order or judgment is limited to (1) "cases under title 11," § 157(b)(1); (2) "core" bankruptcy proceedings that either "arise under" the Bankruptcy Code or "arise in" a case under the Code, *id.*; or (3) cases in which all interested parties "consent" to the bankruptcy court having jurisdiction to enter a final order in a matter that is "related to" a case under the Bankruptcy Code, § 157(c)(2); *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982); *Harris v. Wittman* (*In re Harris*), 590 F.3d 730, 737 & n.3 (9th Cir. 2009).

In addition, bankruptcy courts retain jurisdiction to enter findings of fact and conclusions of law—which the district court is free to adopt or disregard after *de novo* review, § 158(a)—in (1) "non-core" proceedings that either "arise under" the Bankruptcy Code, "arise in" a case under the Code, or "relate to" a case under the Code, *see* §§ 157(a), (b) and 1334; or (2) "core" proceedings that "relate to" a case under the Bankruptcy Code, but neither "arise under" the Code nor "arise in" a case under the Code, *id.*

Finally, even if a bankruptcy court does not have "arising under" jurisdiction, it can retain jurisdiction under a theory of ancillary jurisdiction if re-opening the case is necessary "(1) to permit disposition by a single court of factually interdependent claims, [or] (2) to enable [the bankruptcy] court to vindi-

cate its authority and effectuate its decrees." *See Sea Hawk Seafoods, Inc. v. Alaska* (*In re Valdez Fisheries Dev. Ass'n, Inc.*), 439 F.3d 545, 549 (9th Cir. 2006) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379-80 (1994)).

We consider each of these possible bases of jurisdiction in turn.

## A. Statutory Jurisdiction

### 1. "Arising In" or "Arising Under" Jurisdiction

Jessen takes the position that we should affirm the BAP because the state court action "required resolution of a substantial question of bankruptcy law" and was, therefore, a core proceeding. However, neither the decisions underlying the BAP's disposition, nor the cases Jessen cites on appeal, compel the conclusion that BG Plaza's state court action arose under the bankruptcy code. Instead, the better understanding of this case is as a run-of-the-mill collateral attack in which BG Plaza was free to bring its breach of contract action in state court, which, in turn, would have been obligated to examine the preclusive effects of the bankruptcy court's unappealed Sale Order, issued over BG Plaza's opposition.

Congress non-exhaustively enumerated what constitutes a "core" proceeding in 28 U.S.C. § 157(b)(2). The proceedings listed include matters affecting the administration of the estate, determination of the validity, extent, or priority of liens, and other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship. § 157(b)(2)(A), (K), (O). "[The] section, however, does not enumerate examples of, or define what constitutes, 'non-core' proceedings." *Dunmore v. United States*, 358 F.3d 1107, 1114 (9th Cir. 2004). We have addressed this question, holding proceedings to be "non-core" "if they do not depend on the Bankruptcy Code for their existence and they could proceed in another court." *Id.* (internal citation omit-

ted). In another articulation, we stated a core proceeding is one that "invokes a substantive right provided by title 11 or . . . a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Gruntz v. County of L.A.* (*In re Gruntz*), 202 F.3d 1074, 1081 (9th Cir. 2000) (internal quotation marks omitted).

**[3]** Here, BG Plaza's claim for breach of contract arising out of the Sellers' purported failure to comply with the right of first refusal does not, "by its nature . . . arise only in the context of a bankruptcy case." *Id.* A matter "arises under" the Bankruptcy Code if its existence depends on a substantive provision of bankruptcy law, that is, if it involves a cause of action created or determined by a statutory provision of the Bankruptcy Code. *In re Harris*, 590 F.3d at 737; *Eastport Assocs. v. City of L.A.* (*In re Eastport Assocs.*), 935 F.2d 1071, 1076 (9th Cir. 1991) (citing *Wood v. Wood* (*In re Wood*), 825 F.2d 90, 96 (5th Cir. 1987)); *Collier on Bankruptcy* § 3.01[3][c][i]. Because the theory of its claim is a state law contract action independent of the bankruptcy case, BG Plaza's claim against the Sellers is not one "arising under" the Bankruptcy Code.

**[4]** A proceeding "arises in" a case under the Bankruptcy Code if it is an administrative matter unique to the bankruptcy process that has no independent existence outside of bankruptcy and could not be brought in another forum, but whose cause of action is not expressly rooted in the Bankruptcy Code. *See In re Marshall*, 600 F.3d at 1054-5; *Collier on Bankruptcy* § 3.01[3][c][iv]. Here, too, BG Plaza's Washington breach of contract claim does not depend on an administrative matter unique to the bankruptcy process that has no independent existence outside of the bankruptcy court and could not be brought in another forum.

None of the cases Jessen cites or on which the BAP relied persuades us otherwise. The BAP first considered *Beneficial Trust Deeds v. Franklin* (*In re Franklin*), in which the

plaintiffs-debtors' property was sold pursuant to a settlement of a second bankruptcy petition, notwithstanding debtors' filing of a third petition, which they claimed renewed the automatic stay preventing valid sale of the property. 802 F.2d 324, 325 (9th Cir. 1986). The plaintiffs sought relief in state court to, *inter alia*, set aside the trustee's foreclosure sale and to cancel recorded deeds resulting from the sale. *Id.* at 325-26. We held that, where the subsequent collateral attack turned on whether or not the bankruptcy judge's "order . . . entering the stipulation of the parties had the effect of preventing the automatic stay imposed by the filing of the Debtors [sic] third bankruptcy petition from interfering with the" sale, the bankruptcy court retained jurisdiction. *Id.* at 326.

In other words, we found "arising under" jurisdiction in *In re Franklin* because the relevant contract was a stipulated settlement of the bankruptcy proceeding, and the issue the plaintiffs attempted to bring in state court was the effect of the stipulation on the automatic stay provision, a fundamental aspect of the Bankruptcy Code. *Id.*; *see* 11 U.S.C. § 362. Here, on the other hand, BG Plaza sought to bring a breach-of-contract claim created under Washington law based on a right of first refusal agreement entered into entirely independently of the bankruptcy action.

The BAP also cited *McCowan v. Fraley* (*In re McCowan*), 296 B.R. 1, 4 (B.A.P. 9th Cir. 2003), but this case also fails to compel a finding that the bankruptcy court had arising-under jurisdiction. In *In re McCowan*, after a Chapter 7 case had closed, a creditor attempted to execute on a judgment the bankruptcy court had previously entered fixing the amount of the debtor's nondischargeable debt to the creditor. *Id.* at 2. The bankruptcy court concluded it had "jurisdiction to determine the dischargeability of a debt owed by a bankruptcy debtor," because "such a proceeding 'arises under' the Bankruptcy Code, because it is a cause of action created by § 523 of the Bankruptcy Code." *Id.* at 3 (internal citation omitted).

**[5]** Here, in contrast, the cause of action was not under the Bankruptcy Code at all; it was indisputably under Washington contract law. Further, the determination BG Plaza sought was not whether Ray had discharged his bankruptcy debts—he had—but whether the Sellers (which included a non-debtor party) had breached the terms of the right of first refusal. *The action in In re McCowan* was for the direct enforcement of the bankruptcy court's order, a very different posture from the case before us.[5]

Finally, the BAP relied on its opinion in *Aheong v. Mellon Mortgage Co. (In re Aheong)*, 276 B.R. 233 (B.A.P. 9th Cir. 2002), but that case is easily distinguishable. There, a debtor filed an emergency state court motion claiming an order granting the creditor's writ of possession for debtor's residence was void because it was obtained in violation of the bankruptcy court's automatic stay. *Id.* at 237. The state court granted a stay to allow time for clarification from the bankruptcy court. The bankruptcy court in turn granted the creditor's Motion to Annul the Stay on the grounds that the debtor had violated a General Order of the bankruptcy court regarding noticing the state court of the federal bankruptcy filing. *Id.*

Thus, in *In re Aheong*, the bankruptcy court had jurisdiction to consider annulling a stay in the bankruptcy proceeding because, as the BAP rhetorically asked, "What could be more 'under' Title 11 than the automatic stay and the right to seek to annul it?" *Id.* at 250 (citations omitted). Given the role the automatic stay plays in bankruptcy proceedings, we agree with this aspect of *In re Aheong*'s reasoning, and conclude that it actually serves to distinguish the breach of contract action here.

---

[5]*In re McCowan*'s statement that, "[i]t is not relevant to the analysis whether the underlying bankruptcy case has been closed," may be helpful to Jessen, but such a rule is a necessary, not a sufficient, condition of jurisdiction here. 296 B.R. at 4.

Jessen's citation to *Hawaiian Airlines, Inc. v. Mesa Air Group, Inc.*, 355 B.R. 214 (D. Haw. 2006), is no more helpful to his claim of jurisdiction. He relies on its statement that "[a] post-confirmation proceeding involving a bankruptcy court's enforcement of its own order is a core proceeding." *Id.* at 219.[6] Putting aside for a moment the analytical overlap with our inquiry into ancillary jurisdiction below, *Hawaiian Airlines* involved the alleged breach of a confidentiality agreement entered into "pursuant to the bankruptcy court's Plan Procedures Order," and was *between one of the parties and the bankruptcy trustee*, *id.* at 220, a plainly different posture from this case.

Finally, in a case handed down after the parties' initial appellate briefing, we recently elaborated on the applicable standard. In *In re Harris*, we explained, "A civil proceeding 'arises in' a Title 11 case when it is not created or determined by the bankruptcy code, but where it would have no existence outside of a bankruptcy case." 590 F.3d at 737. There, a Chapter 7 debtor brought a state court action against the bankruptcy trustee and other representatives of the estate, claiming the defendants breached a settlement agreement entered into during the course of the bankruptcy proceedings, which was related to the administration of estate assets. *Id.* at 734-35. We held that the "claim arose in [the debtor's] bankruptcy case because it could not exist independently of his bankruptcy case." *Id.* at 738; *see also Maitland v. Mitchell* (*In re Harris Pine Mills*), 44 F.3d 1431, 1435-38 (9th Cir. 1995).

---

[6]Jessen also discusses two additional cases. First, he cites *State of Montana v. Goldin* (*In re Pegasus Gold Corp.*), 394 F.3d 1189 (9th Cir. 2005), which we consider below. Second, he cites the discussion in *Fietz v. Great Western Savings* (*In re Fietz*), 852 F.2d 455, 456 (9th Cir. 1988), of preconfirmation matters, but our reasoning in *In re Fietz* is necessarily less on point than *In re Pegasus Gold Corp.*, which is a more recent case and determined the "close nexus" test should apply when the bankruptcy estate is post-confirmation. *See In re Pegasus Gold Corp.*, 394 F.3d at 1194.

**[6]** Although we found jurisdiction proper in *In re Harris*, the facts there are easily distinguishable and our reasoning supports finding the bankruptcy court here lacked jurisdiction. Here, the claims involve a piece of property a third party was trying to purchase from the Debtor and his non-bankruptcy partner, and the state court action is a breach of contract action claiming the Sellers did not honor the terms of the right of first refusal, which itself was created under Washington law rather than as part of the bankruptcy proceeding. Thus, following our reasoning in *In re Harris*, an action for breach of the right of first refusal can exist independently of the bankruptcy case, and does not arise under Title 11. *See* 590 F.3d at 737-38.

### 2.    *"Related to"  Jurisdiction*

**[7]** Of course, even if the state court action did not arise under the bankruptcy code, it could still be "related to" a bankruptcy case such that the bankruptcy court retains jurisdiction to provide findings of fact and conclusions of law to the district court. *See* 28 U.S.C. § 157(c)(1). Although "post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation jurisdiction," the set of cases "related to" a bankruptcy case is "much broader" than the set of "arising under" cases. *In re Pegasus Gold Corp.*, 394 F.3d at 1193, 1194. In considering whether a bankruptcy court has jurisdiction over a state contract action related to a post-confirmation liquidation plan, we have adopted the "close nexus" test, explaining that "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Id.* at 1194.

In attempting to demonstrate how the state court action is "related to" the bankruptcy proceeding, Jessen claims that "altering the rights in the property so long after the disposition of the property could set off a chain reaction that would include the estate, the buyers, title companies, insurance com-

panies, and other far reaching parties." We disagree and find the state court action lacking a close nexus to the bankruptcy plan or proceeding.

Our decision in *In re Valdez Fisheries*, 439 F.3d at 545, is instructive. There, we found the bankruptcy court lacked "related to" jurisdiction to interpret a settlement agreement between two creditors in a suit brought after the closing and dismissal of the underlying bankruptcy case. *Id.* at 546-47. The debtor there claimed that creditor seafood processing plant had fraudulently conveyed funds to repay a state loan rather than paying its prioritized creditors. *Id.* The debtor and creditor subsequently entered into a settlement agreement requiring dismissal of all claims between them and stating the bankruptcy court would continue to have jurisdiction over the settlement. *Id.* at 547. Shortly after the termination of the bankruptcy proceedings, the creditor sued the State of Alaska in state court, claiming its Division of Investments was the recipient of the fraudulent conveyance from the debtor, which repaid over $2 million in State loans before paying the seafood processor. *Id.* Like here, the state court directed the parties to seek a determination on the scope of the settlement agreement in the bankruptcy court, which in turn found it had jurisdiction over the proceeding as one related to bankruptcy. *Id.*

The district court affirmed, but we reversed, finding that reopening the bankruptcy case to determine liability between the creditor and the state "could not conceivably alter the debtor's rights, liabilities, options, or freedom of action or in any way impact upon the handling and administration of the bankrupt estate." *Id.* at 547-48 (internal quotation marks and alterations omitted). We distinguished *In re Pegasus Gold Corp.*, explaining that there we had "found the requisite close nexus to exist where the post-confirmation claims asserted that the defendant breached the Reorganization Plan and where the outcome of those claims could affect the implementation and execution of the Plan." *Id.* at 548. Instead, we rea-

soned, the bankruptcy court in *In re Valdez Fisheries* had no role in the resolution of the dispute and was "involved only fortuitously because the dispute implicate[d] the terms of a settlement agreement approved by the court as a precondition of the dismissal of [the] bankruptcy." *Id.*

That statement of our rationale could be substituted here verbatim if we replaced "settlement agreement" with "sale order." BG Plaza is similarly situated to the seafood processor in *In re Valdez Fisheries*—pleading a potentially fraudulent conveyance in state court—and Maldonado is situated similarly to the state of Alaska—as a recipient of property from the bankruptcy estate in a case the bankruptcy court has dismissed and in which it has entered a final decree.[7]

**[8]** There is no doubt that BG Plaza's claims would undermine the effect of the bankruptcy court's well-reasoned determination that Sellers did not violate the right of first refusal. However, such attacks in a second court are routine—and routinely rejected, and Jessen offers no convincing argument why that fact alone creates jurisdiction under § 1334(b). *See* Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4405 (2d. ed. 1988) ("Ordinarily both issue preclusion and claim preclusion are enforced by awaiting a second action in which they are pleaded and proved by the party asserting them," and "[t]he first court does not get to dictate to other courts the preclusion consequences of its own judgment."). Therefore, the bank-

_____

[7]The situation here may not be identical because in addition to the third party defendants (here Maldonado and Jessen), the debtor (Ray) was named in the state court complaint; however, the core insights that the bankruptcy proceeding is over, that a ruling on the state court claim by the state court would not affect the bankruptcy estate, and that the state court claim should look to the preclusive effect of that proceeding, remain the same. *See* 439 F.3d at 548. Further, it is not perfectly clear from *In re Valdez Fisheries* that the debtor was not also a defendant in the subsequent state court suit, *id.* at 546-47, so the case may not even be distinguishable on that ground.

ruptcy court did not retain "related to" jurisdiction for this breach of contract action that could have existed entirely apart from the bankruptcy proceeding and did not necessarily depend upon resolution of a substantial question of bankruptcy law. *See In re Harris*, 590 F.3d at 737; *In re Valdez Fisheries*, 439 F.3d at 546.

## B. Ancillary Jurisdiction

Jessen also argues the bankruptcy court retained ancillary jurisdiction because "the Bankruptcy Court was asked by Ray and by the state court to effectuate its own prior Sale Orders." The BAP found ancillary jurisdiction as well, holding that "the bankruptcy court had ancillary jurisdiction to interpret and enforce its prior orders."

**[9]** "Ancillary jurisdiction may rest on one of two bases: (1) to permit disposition by a single court of factually interdependent claims, and (2) to enable a court to vindicate its authority and effectuate its decrees." *In re Valdez Fisheries*, 439 F.3d at 549 (citing *Kokkonen*, 511 U.S. at 379-80). Jessen only invokes the bankruptcy court's need to effectuate its decrees.

The Supreme Court has explained that it has never "relied upon a relationship so tenuous as the breach of an agreement that produced the dismissal of an earlier federal suit" to support ancillary jurisdiction. *Kokkonen*, 511 U.S. at 379. We have elaborated that a bankruptcy court has subject matter jurisdiction to interpret orders entered prior to dismissal of the underlying bankruptcy case, *In re Franklin*, 802 F.2d at 326-27, "and to dispose of ancillary matters such as an application for an award of attorney's fees for services rendered in connection with the underlying action," *Tsafaroff v. Taylor* (*In re Taylor*), 884 F.2d 478, 481 (9th Cir. 1989). Alternatively, "[t]he bankruptcy court does not have jurisdiction, however, to grant new relief independent of its prior rulings once the underlying action has been dismissed." *Id.*

The BAP again relied on *In re Aheong*, invoking language explaining that, there, "[b]y granting [a] Motion to Annul the Stay the bankruptcy court was acting to 'interpret' and 'effectuate' General Order No. 1, which directed Debtor to notify [the creditor] and the state court of her bankruptcy filing and provided that 'failure to give such notice . . . may constitute cause for nullification of the automatic stay." 276 B.R. at 240. The BAP found the situation here analogous because, it reasoned, "BG Plaza LLC's action for specific performance . . . would, if successful, eviscerate the previously approved sale of the Debtor's interest in the ½-Acre parcel."

"Ordinarily, once the bankruptcy court confirms a plan of reorganization . . . [a] debtor is usually without the protection of the bankruptcy court." *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*, 997 F.2d 581, 589 (9th Cir. 1993). This is why, for example, we have rejected ancillary jurisdiction when a party sued on the terms of a settlement agreement after the bankruptcy case had closed and the estate was settled. *In re Valdez Fisheries*, 439 F.3d at 549-50. It is also why the BAP has rejected ancillary jurisdiction on attorneys fees— a subject which would normally be within a court's ancillary jurisdiction—effectively requiring a state court to rule, when the debtor-defendant fighting fees claimed the fees were secured fraudulently because the attorney failed to disclose required information to the bankruptcy court. *Elias v. Lisowski Law Firm, CHTD* (*In re Elias*), 215 B.R. 600, 603-17 (B.A.P. 9th Cir. 1997).[8]

---

[8]Nor does the bankruptcy court's express retention of jurisdiction, alone, bring this case within its ancillary jurisdiction. Jessen highlights language from the order confirming the Plan, stating the bankruptcy court "shall retain jurisdiction of this case to determine any controversies in connection with assets of the bankruptcy estate." But Jessen fails to cite a single case suggesting this language can support jurisdiction, which is constitutionally limited, *see N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), a particular failure given the burden of demonstrating jurisdiction lies with the party asserting it. *See Kokkonen*, 511 U.S. at 377. Nor, at oral argument, could Jessen provide any limiting principle that would *ever* cut off the bankruptcy court's jurisdiction to re-visit its previous decisions in closed cases.

**[10]** In short, hearing a breach of contract claim predicated on evidence that came to light after a bankruptcy case had closed, its creditors paid, and the debtor discharged, stretches the limits of the bankruptcy court's ancillary jurisdiction too far, going beyond what is necessary for the bankruptcy court to "effectuate its decrees." *Kokkonen*, 511 U.S. at 380. This conclusion is supported by the record, which demonstrates the bankruptcy judge's reluctance to accept jurisdiction and his recognition that particularly the inclusion of Jessen and Maldonado seemed to raise issues beyond the Debtor's bankruptcy case.

**[11]** "[O]nce the bankruptcy court confirms a plan of reorganization, the debtor is free to go about its business without further supervision or approval of the court, and concomitantly, without further protection of the court." *Sw. Marine, Inc. v. Danzig*, 217 F.3d 1128, 1140 (9th Cir. 2000) (internal citations omitted). Reopening of the bankruptcy claim is rare, and only used when necessary to resolve bankruptcy issues, not to adjudicate state law claims that can be adjudicated in state court.

## IV.   CONCLUSION

**[12]** For the foregoing reasons the bankruptcy court lacked jurisdiction over the state law breach of contract claims, and the case must be dismissed. The Clark County Court was perfectly capable of taking jurisdiction and assessing whether BG Plaza's claim is precluded given that the sale had already been finalized and approved in the previous bankruptcy proceeding.

**REVERSED and REMANDED for further proceedings consistent with this Opinion.**