**In re Clifford H. EASTLICK, Amy E. Eastlick, Debtors.**

No. 00–20112.

United States Bankruptcy Court, D. Idaho.

Dec. 7, 2004.

tion under Rule 3008 and been adequately briefed for this appeal. USF failed in both

respects.

Julie L. Doty, Coeur d'Alene, ID, Philip H. Robinson, Sandpoint, ID, for Debtors.

## MEMORANDUM OF DECISION

TERRY L. MYERS, Chief Judge.

### INTRODUCTION

Bankruptcy debtors often present the Court with claims that creditors have violated either the automatic stay or the discharge injunction. But this is an unusual case. Here, such claims are leveled by one debtor against his codebtor.

It is also unusual in that the allegations about violations of fundamental bankruptcy protections are asserted many years after this bankruptcy case was opened, quickly administered as a "no asset" chapter 7 liquidation, and closed simultaneously with entry of the debtors' discharge.

The Bankruptcy Code only recognizes spouses as joint debtors. *See* § 302 (providing for a "joint case" by an individual and that individual's spouse).[1] As might be rather quickly surmised, the joint debtors who commenced the instant case in 2000 are no longer married. They were, In fact, divorced not long after the bankruptcy petition was filed.

Their situation, just prior to their bankruptcy and their divorce, was marked by disagreement and distrust. It only got worse, with protracted and bitterly antagonistic litigation.[2]

For many years, that litigation was a state court problem. The parties came back to this Court when one of the debtors raised questions of bankruptcy law that the state court judge, in her discretion, determined were best resolved here. The Court, having now heard extensively from the parties, is in a position to do so.

### PROCEDURAL BACKGROUND

One of the joint debtors, Clifford Eastlick ("Clifford"), obtained approval to re-open this long-closed chapter 7 case. *See* § 350(b).[3] He also filed a motion against his joint debtor and now ex-spouse, Amy Robinson Eastlick ("Amy"), and against Amy's father and attorney, Phillip H. Robinson ("Robinson"). *See* Doc. No. 8 ("Motion").[4]

Clifford contends that certain actions and conduct of Amy and of Robinson violated the automatic stay of § 362(a). He characterizes these violations as willful and, thus, claims under § 362(h) a right to actual damages, attorneys' fees and costs, and punitive damages.[5] Clifford also claims that certain acts taken while the stay was in effect, particularly entry by

---

1. Absent other indication, all statutory references are to the Bankruptcy Code, Title 11, U.S.Code.

2. The parties' lawyers aggravated, rather than ameliorated, the situation. Their conduct increased the intensity of the disputes, resulting in inordinately expensive, emotionally charged litigation. The lawyers have engaged in the same sort of highly contentious conduct before this Court, even making charges of personal and professional misconduct against each other.

3. The motion to reopen the case was filed in January, 2004. *See* Doc. No. 6. It was granted by order entered April 22, 2004. Doc. No. 23.

4. The Motion sought relief under § 362(h) and thus constituted a "contested matter" under Fed. R. Bankr.P. 9014. *See In re Andrus*, 04.3 I.B.C.R. 137, 2004 WL 2216493 (Bankr.D.Idaho 2004). To the extent other relief sought by Clifford may have needed an adversary proceeding, the parties agreed to waive the same and to have a consolidated hearing on all issues under this contested matter.

5. Section 362(h) provides: "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

the state court[6] of a decree of divorce, are void.[7]

▪ Clifford further argues that, after he and Amy received their bankruptcy discharge, Robinson and Amy continued to violate his rights, this time in contravention of § 524.[8] This conduct, Clifford contends, supports an award of damages under this Court's contempt powers.[9]

An extensive evidentiary hearing was conducted on this matter.[10] Following completion of post-hearing briefing on September 7, the Court took all issues under advisement. This Decision constitutes the Court's findings of fact[11] and conclusions of law.[12]

## FACTS

Clifford and Amy were married in 1991. In October, 1999, they separated. Clifford moved out of the marital home at 1614 East 1st St., Post Falls, Idaho.

Clifford was a long-haul truck driver during the parties' marriage as well as at and after the date of separation. Amy did not work outside the home but, instead, cared for the parties' three minor children born between 1992 and 1998.

Amy decided to divorce Clifford, and turned to her father, Robinson, who practices law in Bonner County, Idaho, for assistance.[13] Robinson prepared a quitclaim deed and a bill of sale for Amy's use. *See* Ex. 13 and Ex. 14. Under these documents, Clifford would convey to Amy all of his interests in the community residence and in a Subaru automobile. When Clifford returned to the Post Falls area from a hauling job on October 22, 1999, Amy ob-

---

**6.** All references to the state court or the litigation before it are to the action entitled *Amy Eastlick v. Clifford Eastlick,* Case No. CV–99–01537, First Judicial District, State of Idaho, in and for Bonner County, presided over by the Hon. Barbara J. Buchanan.

**7.** *See generally Schwartz v. United States (In re Schwartz),* 954 F.2d 569, 572–74 (9th Cir. 1992) (acts taken in violation of the automatic stay of § 362(a) are void, not merely voidable).

**8.** Section 524 provides in pertinent part:
(a) A discharge in a case under this title—
(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;
(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and
(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an

act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge . . . .

**9.** Unlike the statutory remedy for violations of stay provided in § 362(h), violations of the discharge injunction are enforceable through contempt. This is discussed further below.

**10.** The hearing was held on April 12, May 11, July 7 and August 3, 2004.

**11.** The Court's findings of fact include and incorporate its evaluation of witnesses' credibility, and its evaluation of the weight to be ascribed to any of the testimony heard or to any of the documents admitted into evidence.

**12.** *See* Fed. R. Bank. P. 7052 (incorporating Fed.R.Civ.P. 52). Bankruptcy Rule 7052 is applicable in this contested matter by virtue of Fed. R. Bankr.P. 9014.

**13.** Robinson has a civil practice as well as serving as the Bonner County Prosecuting Attorney.

tained his signature on the deed and the bill of sale.[14]

Clifford agreed to these transfers, and knew that they were in contemplation of and in connection with the anticipated divorce. He also knew that the documents came from his father in law, Robinson, whom Clifford believed was assisting in obtaining a prompt, mutually desired, and essentially "uncontested" divorce.[15]

Clifford not only made these real and personal property transfers, but also agreed to sign an Acceptance of Service, Stipulation to Entry of Decree of Divorce, Judgment and Orders, and Waiver of Time. *See* Ex. 3. In this document, also authored by Robinson, Clifford "stipulates . . . to entry of a Decree of Divorce, Judgment, and Orders consistent with the provisions of the Complaint filed herein, and does hereby waive his right to respond to the same, and further waives the waiting time for entry of the Decree[.]" *Id.* His acceptance of service and stipulation was made "freely, knowingly, and voluntarily" according to the document. *Id.*[16]

This acknowledgment and consent related to Amy's divorce complaint, which Robinson had also prepared. *See* Ex. 1. That complaint was filed on December 16, 1999. *Id.* The consent was signed by Clifford on December 23, 1999, and was filed on December 28. The Eastlicks' "Decree of Divorce, Judgment, and Orders" was entered by the state court on February 16, 2000. *See* Ex. 4 ("Decree").

■ At the time of their separation, Amy and Clifford had serious financial problems. They determined they should file a joint chapter 7 bankruptcy in order to discharge their debts and to do so while they were obtaining their divorce. Amy obtained the forms needed for the bankruptcy from a "self-help" shop and completed them with Robinson's review and assistance.[17] The petition and related doc-

---

14. Clifford testified that he signed these documents at Amy's house, and he contends that Amy or Robinson later had a notary falsely complete the acknowledgments that attested Clifford signed in the notary's presence. Amy testified that Clifford signed each document in the presence of the notary, one at a bank and the other at a pawn shop, while Amy watched. Inasmuch as Clifford admits signing the documents, the dispute has little significance. It was, however, indicative of the parties' inability to agree on virtually anything, and of their unflagging attempts to attack the credibility of the other.

15. The documents in the state court action reflect that Robinson represented Amy alone, and not Clifford. This is consistent with the weight of the testimony. But while Robinson did not represent Clifford, the idea that the divorce was mutually desired and that Clifford and Amy agreed to let Robinson handle the legal details is consistent with all the circumstances. Given the Eastlicks' financial condition at that time, it is unlikely either could have afforded counsel but for the familial relationship that existed here.

16. Clifford testified that, contrary to this representation, he felt intimidated and bullied by Robinson. Robinson says he did not talk to Clifford much, and denies any intimidation. However, the issues before the Court do not turn on a resolution of this dispute.

17. There was conflicting testimony about Robinson's involvement. Robinson claimed Amy alone was responsible for the bankruptcy paperwork and filing. *Accord* Doc. No. 38 at 3, 11–12. The Court finds this inaccurate, Amy testified as to Robinson's review and his staff's clerical assistance, and to the fact that Robinson's office handled the actual filing of the case with this Court. Even if Robinson did not "advise" Amy about technical bankruptcy issues, his involvement was material and not merely incidental. And although Robinson and his office staff were directly involved in the preparation of the petition, schedules and statements, and handled the actual filing with the Court, there is no disclosure of that involvement. Clifford correctly notes that "ghostwriting" of bankruptcy petitions and documents for use by putatively *pro se* debtors is improper and has been strongly

uments needed for the bankruptcy filing were signed by Clifford and Amy on January 14, 2000, and the case was filed by them, as *pro se* debtors, on February 8, 2000. Doc. No. 1. Both Amy and Clifford signed the petition and schedules under penalty of perjury. *Id.* Clifford's involvement in the filing appears to have been minimal.

While both Clifford and Amy were well aware of the pending divorce action at the time they commenced their bankruptcy on February 8, they failed to disclose the divorce litigation in their schedules or statement of financial affairs, nor did they otherwise bring it to the attention of their chapter 7 trustee.[18] And, while they were similarly aware of their bankruptcy filing, neither Amy nor Clifford, nor Robinson, brought the existence of the pending chapter 7 case to the attention of the state court.

Robinson and his wife, and Robinson's parents (Amy's grandparents) Daniel and Lorna Robinson, were Clifford and Amy's creditors. A debt to Daniel and Lorna, secured by the residence, was shown in the schedules. *See* Doc. No. 1 at schedule D. However Daniel and Lorna were also owed an unsecured debt of $7,023.34. *See* Ex. 1 at 5. This debt was not shown in the schedules. Further, Robinson and his wife were personally owed $5,000.00. Ex. 1 at 10. This debt was also not scheduled. *See* Doc. No. 1.[19] Given the complaint he had

prepared for Amy, Robinson was obviously aware of the family debts and, given his and his staff's involvement, Robinson was obviously aware of the bankruptcy filing from its inception.

On February 16, Robinson and Amy appeared before the state court and, following Amy's uncontested testimony, obtained entry of the divorce decree. Amy intentionally delayed obtaining the Decree until after the bankruptcy had been filed due to her understanding that the joint bankruptcy case had to be commenced by "married" debtors.

The Decree required community tax refunds to be used to pay Amy's student loans, which she knew were nondischargeable debts. Ex. 4 at 4. The Decree required the $7,023.34 debt to Daniel and Lorna Robinson be split with each spouse to pay $3,516.67. *Id.* at 5. Clifford was also required to pay half of the $5,000.00 debt to Robinson. *Id.* at 9. Clifford was assigned and obligated to pay numerous other debts for a specific period of time, including the payments to the creditor secured on the Subaru he transferred to Amy. *Id.* at 5–7.[20]

Clifford was obligated to pay child support of $950.00 per month, *id.* at 7–8, and also provide medical, dental and optical insurance. *Id.* at 8–9. The child support was premised on an Affidavit Verifying Income filed on December 16, 1999. *See*

---

criticized. *See In re Castorena,* 270 B.R. 504, 01.4 I.B.C.R. 153 (Bankr.D.Idaho 2001). However, the present litigation concerns questions of violation of § 362(a) and § 524(a), and the issue of ghostwriting the filing is tangential at best.

**18.** They also failed to disclose in the statement of financial affairs the transfer of Clifford's interest in the residence or vehicle under Exhibit 13 and Exhibit 14.

**19.** Though these two debts were omitted, the Eastlicks' schedule F (unsecured creditors) ran some 40 pages and listed over $68,000.00 of debt. Doc. No. 1.

**20.** There were no prepetition debts properly reaffirmed in the bankruptcy case consistent with the requirements of § 524(c) and LBR 4008.1. As a result, there were no valid or enforceable reaffirmed debts. *Bankr. Receivables Mgmt. v. Lopez (In re Lopez),* 345 F.3d 701, 708–09 (9th Cir.2003).

Ex. 2. Robinson signed and was the "party submitting" this affidavit. *Id.*

The marital address in Post Falls was used on the bankruptcy petition for both Clifford and Amy, even though by the time it was filed in February, 2000, Clifford and Amy had already separated and Clifford was living elsewhere. According to Amy, Clifford would get copies of mailed bankruptcy notices by stopping by the residence and picking them up. She indicates that in this way he learned of the date of the § 341(a) creditors' meeting.

The meeting of creditors under § 341(a) and examination of debtors under § 343 occurred on March 28, 2000. Amy indicates that she and Clifford both appeared. Clifford filed an affidavit in state court indicating he did not attend any bankruptcy hearings.[21]

According to Amy, immediately after the creditors' meeting, Clifford signed an Absolute Assignment of Policy, Ex. EE, transferring to her all interests and benefits under a life insurance policy on his life. Clifford admits signing it. He does not remember where that occurred. That exhibit bears a March 28, 2000 date. Clifford says the date on the document is not in his handwriting.

Subsequent to the meeting of creditors on March 28 and the completion of his

review of the debtors' disclosures and schedules, the chapter 7 trustee filed a report of no distribution (sometimes called a "no asset" report) on May 9, 2000. An order granting Clifford and Amy's discharge was entered by the Court on May 31, 2000. Doc. No. 5. That same order closed the case.

Before the discharge was entered and while the automatic stay was still in effect,[22] Amy filed (through Robinson) on May 16, 2000, a Motion to Amend and Modify Divorce Decree. Ex. 5. This motion sought to have Clifford and Amy's 1999 tax liability assigned solely to Clifford. The motion was served on Clifford by mailing it to his parents' house. The motion was granted by the state court on June 27, 2000. Ex. 6. This followed a June 19 hearing which Amy and Robinson attended.

Following the May 31, 2000 discharge, additional litigation occurred in the state court action. *See generally* Ex. 10. In the fall of 2001, there were custody, visitation and support disputes. *See, e.g.,* Ex. D, E, F.[23]

In November, 2002, Amy applied for a writ of execution, which was granted *ex parte. See* Ex. 7, Ex. 8. Numerous discovery requests were made by Amy. *See* Ex. 11. Several of the discovery requests be-

---

**21.** The minutes of the meeting filed by the chapter 7 trustee reflect that the "debtor" appeared and testified. *See* Ex. DD. This was prior to modification of the form minutes to clearly indicate, in cases of joint debtors, that each personally appeared, was sworn and testified.

**22.** In brief, the automatic stay of § 362(a) remains in effect as to a chapter 7 debtor until that debtor's discharge is granted or denied. *See* § 362(c)(2)(C). The debtor's protections under the stay are at that time effectively replaced by the injunctive provisions of the discharge. *See* § 524(a). The automatic stay remains in effect as to "prop-

erty of the estate" (*see* § 541(a)) until such property no longer retains that status, which occurs upon an express abandonment by order of the Court or upon closing of the case if the property at that time remains unadministered. *See* § 554(b), (c).

**23.** Support obligations are outside the reach of the discharge. *See* § 523(a)(5). Custody and support issues are also not subject to the automatic stay during the period from filing to discharge. *See* § 362(b)(2)(A)(ii) and (b)(2)(B). Clifford does not contend that the custody and support litigation is a violation of the stay or the discharge.

came the subject of motions to compel. *See* Ex. 12.

In all these matters, Amy was represented by Robinson. Clifford was for some time represented by attorney Kevin Waite. Later, Clifford's current counsel substituted, and they eventually raised questions about the bankruptcy filing, automatic stay and discharge to the state court in 2003.

In January 2004, the motion to reopen the chapter 7 case was filed and, after contested hearing, was granted. The parties then commenced the process of litigating Clifford's motion for sanctions.

## DISCUSSION AND DISPOSITION

As noted, Clifford's claims fall into two categories. He asserts that certain conduct violated the automatic stay of § 362(a). He also asserts that other, later conduct violated the discharge injunction.

### A. Violation of automatic stay

Here, the automatic stay existed between the filing of the petition on February 8, 2000 and May 31, 2000, the date discharge was entered and the case was closed. *See* § 362(c)(2)(C) (providing for termination of stay, as to debtors, at time of granting chapter 7 discharge); *see* § 362(c)(1) and § 554(c) (together providing for termination of stay, as to scheduled property of estate, upon closing).

### 1. Actions in violation of the automatic stay

The acts or conduct violating the stay, according to Clifford, were (a) the solicitation of the assignment of insurance policy

Clifford signed on March 28, 2000; (b) the appearance by Amy and Robinson in state court on February 16, 2000 in furtherance of obtaining the divorce decree; (c) the entry of that Decree by the state court [24] on February 16, 2000; and (d) the filing of Amy's motion to modify the Decree on May 16, 2000.

In order for Clifford to receive relief under § 362(h), the acts must have violated one or more of the provisions of § 362(a). *Accord Andrus*, 04.3 I.B.C.R. at 140 (addressing § 362(a)(3), (a)(4), and (a)(6)).

■ Here, Amy had "claims" against Clifford (and, likely, he against her, though they are not put at issue in this litigation). This is due to the broad definition of claims found in § 101(5).[25] Her appearance in state court on February 16, in support of entry of the Decree, was patently in violation of § 362(a)(1) which *inter alia* prohibits "continuation ... of a judicial ... action or proceeding against the debtor that was ... commenced before the commencement of the [bankruptcy] case." Additionally, Amy and Robinson's failure to advise the state court of the bankruptcy was simply wrong; it showed a lack of appropriate candor, and led the state court into an act that had significant consequences.

■ Amy and Robinson's acts in obtaining Clifford's execution on March 28 of the assignment of the insurance policy may have violated this same subsection, § 362(a)(1), as it appears to be in furtherance of the relief sought in the complaint. It also violated § 362(a)(3), which prohibits

---

24. Clifford wisely does not bring his Motion against the state court or Judge Buchanan. He argues, instead, only that the entry of the Decree was void as being in violation of the stay, and he saves his "willful violation" arguments for Amy and Robinson.

25. That section defines "claim" as including both rights to payment and rights to equitable remedies, even if such rights are unliquidated, contingent, unmatured or disputed. *See* § 101(5).

acts to obtain possession of or exercise control over property of the estate. In addition, the filing of the motion on May 16, 2000, seeking to modify the decree to place the obligation for all 1999 taxes on Clifford constituted a violation of § 362(a)(1) and § 362(a)(6).

## 2. Willfulness

■ This Court stated in *Andrus*:

Once the creditor or actor learns of the bankruptcy filing, any actions intentionally taken thereafter are "willful" within the contemplation of § 362(h). *Eskanos & Adler* [*P.C. v. Leetien*], 309 F.3d [1210 1215 (9th Cir.2002)] ("A willful violation is satisfied if a party knew of the automatic stay, and its actions in violation of the stay were intentional.") (citing *Pinkstaff v. United States (In re Pinkstaff)*, 974 F.2d 113, 115 (9th Cir. 1992)); [*In re*] *Jacobson*, 03.2 I.B.C.R. [119, 121 (Bankr.D.Idaho 2003)] (citations omitted). It is, thus, the intent to act while on notice of the pendency of the bankruptcy case, not a specific intent to violate the stay, that is material. *Associated Credit Servs., Inc. v. Campion (In re Campion)*, 294 B.R. 313 (9th Cir. BAP 2003) states:

There need be no proof of specific intent to violate the stay or to injure. To the contrary, a good faith belief that the stay is not being violated "is not relevant to whether the act was 'willful' or whether compensation must be awarded."

294 B.R. at 316 (footnote and citations omitted); *see also Jacobson*, 03.2 I.B.C.R. at 121 ("Specific intent to violate the stay is not a required element in finding a willful violation.") (citing *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224 (9th Cir.1989)); [*In re*] *Augen-*

*baugh*, 02.4 I.B.C.R. [157, 163 (Bankr.D.Idaho 2002)].

04.3 I.B.C.R. at 141 (footnote omitted).

The actors, Amy and Robinson, were aware of the bankruptcy case from and after its filing on February 16. Thus, their intentional acts and conduct after that date and continuing until the stay was no longer in effect are willful under § 362(h). The parties' arguments as to the nature and degree of Amy's or Robinson's "intent" to violate the stay are misplaced and irrelevant to the question of willfulness under this section.

## 3. Consequences

Ordinarily, the question would next turn to whether Clifford established actual damages suffered by reason of the stay violations, including reasonable fees and costs. *Andrus*, 04.3 I.B.C.R. at 141 (citations omitted). The Court would further have to consider whether the established facts warrant the imposition of punitive damages. *Id.; see also id.* at 144–46. This is not the ordinary case.

■ *Schwartz* establishes that acts taken in violation of the automatic stay are not merely voidable, but are void. 954 F.2d at 571. *See also Fjeldsted v. Lien (In re Fjeldsted)*, 293 B.R. 12, 20 (9th Cir. BAP 2003). Operation of this principle could have significant impact in this case. That is, the violation of stay could have consequences far beyond simply providing a basis for Clifford to argue that Amy and Robinson should pay him damages.

For example, if the entry of the Decree on February 16, 2000 is void, were the parties ever effectively divorced? What are the ramifications of the absence of a valid and effective divorce decree on obligations of support? Are the divisions of assets and property addressed in the decree effective? Have the parties continued

to be married, and what impact might that have on their finances or otherwise? [26]

In the press to (a) void the Decree's several payment obligations and (b) seek recovery of damages for stay violation, these other questions have received scant attention.

### 4. Annulment of stay

■ A typical stay violation involves a creditor repossessing or foreclosing on security, commencing or continuing a collection suit, executing on a judgment, or taking similar acts notwithstanding § 362(a). But here, one joint debtor is claiming that the other joint debtor (and her attorney) violated the stay that protected both debtors and their joint estate. [27]

The context in which all the suggested violations occurred was the continuation of the divorce action. The complaining debtor, Clifford, not only knew about that litigation, he expressly consented to it. He executed an acceptance of service and a stipulation for entry of the Decree. He failed to disclose the divorce in his bankruptcy. And he took no steps to bring the bankruptcy case to the attention of the state court.

This is not a case where a debtor, in true reliance on the respite from creditor action and related protections provided by the stay, seasonably objects to a creditor violating that stay. Clifford's several complaints are all of a different sort: that he was lulled, tricked, cajoled, or intimidated into signing the various documents and consenting to the Decree; that Amy and her father's conduct was deceptive, oppressive, coercive and improper; that the terms of the Decree were unfair, saddled him with too much of the nondischargeable debt, imposed unreasonable support obligations, and denied him reasonable contact and visitation with his children. [28] That the stay was violated is coincidental at best, a fact illuminated by the absence of any protest about § 362 violations for some 3 years. [29]

The Bankruptcy Appellate Panel in *Fjeldsted* held:

A bankruptcy court has authority to make exceptions to, and to annul, the automatic stay under § 362(d). *See Schwartz*, 954 F.2d at 572–73 ("Section 362(d) outlines the bankruptcy court's authority to make exceptions to the general operation of the stay.") This authority includes annulment providing

---

**26.** For example, Clifford remarried. Is he a bigamist?

**27.** The need for this Court to use § 362(h) to protect the bankruptcy estate itself, or the Eastlicks' creditors, is not compelling. The case was administered as a "no asset" chapter 7, reflecting the Trustee's conclusion after investigation that there were no nonexempt assets available for liquidation and distribution to creditors. Third-party creditors' rights were not invaded by the conduct of Amy or Robinson of which Clifford complains. No assets otherwise available for creditors were diverted; all property was exempt and went back to the debtors. The only credible § 362(h) issue relates to protecting Clifford personally from the divorce litigation.

**28.** The Court heard much evidence about these matters. It intentionally refrains from addressing them. These types of complaints, and any potential remedies, are best left to the state court.

**29.** One is advised to tread lightly in considering what might have been. Nevertheless, had Amy and Cliff approached the Trustee and this Court in 2000 with a stipulation for relief from stay, in order to continue with a disclosed divorce action, it is likely stay relief would have been entered. Such stipulations are often approved, providing the litigants and the state court with a level of comfort that what they do will not be called into question later. Here, that sort of order would have eliminated at least the § 362 issues.

retroactive relief, which, if granted, moots any issue as to whether the violating [act] was void because, then, there would have been no actionable stay violation. *See Schwartz*, 954 F.2d at 573.

The Ninth Circuit has held that the bankruptcy court has "wide latitude in crafting relief from the automatic stay, including the power to grant retroactive relief from the stay." *Id.* at 572; *Nat'l Envtl. Waste Corp. [v. City of Riverside (In re Nat'l Envtl. Waste Corp.)]*, 129 F.3d [1052, 1054-55 (9th Cir.1997)]; *Mataya v. Kissinger (In re Kissinger)*, 72 F.3d 107, 109 (9th Cir.1995). 293 B.R. at 21. *See also Stinson v. Bi-Rite Rest. Supply, Inc. (In re Stinson)*, 295 B.R. 109, 116-18 (9th Cir. BAP 2003).

*Fjeldsted* went on to hold that the proper standard to be applied by the court in determining whether to annul the stay retroactively was the "balancing of the equities" test, and that relief was not limited solely to those cases evidencing "extreme circumstances." 293 B.R. at 21-25.[30] This standard was found to fit better with the court's "wide latitude" to find cause and craft relief, and allowed for consideration of a number of potentially relevant factors. *Id.*[31]

■ Among these factors were whether the creditor knew of the bankruptcy; whether the debtor engaged in unreasonable or inequitable conduct; whether prejudice would result to the creditor; the judicial or practical efficacy of annulling the stay; a weighing of the extent of prejudice to third parties if the relief is not made retroactive; the relative ease of restoring the parties to the *status quo ante;* how quickly the creditor moved for annulment, or how quickly the debtor moved to set aside the violative conduct; whether annulment would cause irreparable injury to the debtor; and whether stay relief would promote judicial economy or other efficiencies. 293 B.R. at 23-25. Several of the factors are relevant here.[32]

Amy and Robinson certainly knew of the bankruptcy. But, then, so did Clifford. And Clifford knew of the divorce and the now complained of conduct at or about the time it occurred.

■ It is clear that Clifford did not move promptly to address the allegedly violative conduct. It was not until 2003, several years after the brief temporal existence of the stay between February 16 and May 31, 2000, that Clifford raised the question of its violation. In addition to clearly being a factor under *Fjeldsted,* the delay supports application of the equitable doctrine of laches.[33]

---

**30.** The previous standard of extreme circumstances was analyzed and applied in *Sacred Heart Med. Ctr. v. Hegel (In re Hegel)*, 01.1 I.B.C.R. 19, 21-22 (D.Idaho 2001). The District Court's ruling therein nonetheless evidenced its "weighing" of the equities. *Id.*

**31.** *Fjeldsted* emphasized that the factors are "merely a framework for analysis and not a scorecard" because "one factor may so outweigh the others as to be dispositive." 293 B.R. at 25. Thus a "mechanistic application of [the] factors is inappropriate," and they are only an aid to the court in weighing the equities. *Id.* at 24.

**32.** Though Amy and Robinson have not asked for annulment, that does not remove it from the panoply of Court powers.

**33.** The doctrine bars relief "when there is an unreasonable or unexcused delay by the party asserting the claim and the defending party is prejudiced by the lack of diligence." *Shook v. CBIC (In re Shook)*, 278 B.R. 815, 818 n. 2 (9th Cir. BAP 2002). Laches can be applied "when equitable considerations weigh heavily in favor of the offending creditor and the debtor bears some responsibility for creating the problems." *Wolkowitz v. Shearson Lehman Bros., Inc. (In re Weisberg)*, 193 B.R. 916, 926 (9th Cir. BAP 1996), *aff'd in part and*

The possible prejudice to third parties if relief is not retroactively granted is something on which the Court can only guess. But there are children involved. They have already been, to some degree, placed at issue in the parties' litigation. How much more so, should the divorce itself be nullified, is certainly a concern.

The factors of judicial economy and efficiency, and of restoring the parties to *status quo ante,* are also material. The joint debtors, Amy *and Clifford,* allowed the state court to hear and rule upon matters in the state court case without ever advising it of the pendency of the bankruptcy.

Absent annulment of the stay, the Decree is void. How that result advances judicial economy or the interests of the parties remains unexplained.[34] For certain, Clifford's arguments have focused primarily on the economic consequences of the alleged stay violations—his actual damages, attorneys' fees and costs, and possibly punitive damages. Clifford focused to a lesser degree on the other consequence of finding a stay violation—that the acts are void.[35] But the Court surely cannot ignore that important fact in evaluating the matter, particularly if it is to appropriately balance the equities.

The unique posture of the litigants, with the complaining debtor leveling the § 362(h) charge against his joint debtor; the context in which the acts occurred (a "cooperative" divorce contemporaneously filed with the bankruptcy); the failure of either party to advise the state court of the bankruptcy or to ask this Court for an order terminating the stay; the lengthy delay before violations of § 362(a) were raised; the serious problems that would result from a failure to annul the stay, including a void divorce decree and a number of years of "legal limbo" following that decree; and considerations of judicial economy and efficacy all lead the Court to conclude in its discretion that the equities are best served by annulment of the stay.

Doing so solves the *Schwartz* problem and addresses related concerns identified by the Court. However, the Court is sensitive that doing so also negates Clifford's ability to pursue his claims under § 362(h). *Fjeldsted,* 293 B.R. at 21. The decision is not reached lightly.

In fairness, though, the damages claimed by Clifford (attorneys fees and costs for the most part) are less the result of "stay violation" than of the manner in which the state court litigation was conducted over the years between May 31,

*rev'd in part on other grounds,* 136 F.3d 655 (9th Cir.1998).

34. Assume the Decree is void as a violation of stay. Assume further that Clifford is found entitled to some damages. Upon so holding, this Court's role would likely be ended. But it is safe to say that these parties do not wish to be married today any more than they did in 2000. So, they would return to state court to again obtain entry of a divorce decree. That litigation, with all the predictable disputes over responsibility for debt not discharged in the bankruptcy, custody and support, and the like, renews.

35. In briefing, Clifford argued that the whole of the Decree would have to be held void,

because it was too hard to distinguish between the inequitable and unfair provisions in the Decree and other terms of the Decree. *See, e.g.,* Doc. No. 35 at 10–11. Of course, if void under *Schwartz,* it is entirely void; there is no authority allowing the Court to pick and chose the portions of a void decree it might invalidate. The nature of this argument, in fact, provides additional support for the idea that it is not the stay violation itself that so offends Clifford, but that it is the "undeniably unconscionable" Decree, its "extremely inequitable division of property and debts," its other egregious provisions, and the manner in which it was obtained that concern him. *Id.* at 6, 7.

2000 and January, 2004. *See, e.g.,* Doc. No, 35 at 7–8, 10. If that litigation was abusive, improper, unreasonably burdensome or unduly and unfairly increased the costs to Clifford and reflected a strategy of intimidation and cost-prohibitive legal maneuvering, then Clifford's recourse is with the state court. This Court harbors no doubt that the state court is fully capable of handling its own cases and policing its own litigants. If the tactics employed by Amy and her counsel were offensive, there is a forum. It is not incumbent on this Court to broadly construe § 362 in order to give Clifford a venue for fee shifting in sanction of Amy's conduct or Robinson's behavior.

The annulment of the stay, and the denial of the § 362(h) claims, might be viewed by Amy as a victory. But that should not be confused with a vindication. True, the Court's decision means that fees and costs will not be awarded Clifford under § 362(h), and the question of § 362(h) punitive damages will be rendered moot but this result is driven by the considerations noted above. The decision should in no way be seen as an *imprimatur* for the type of litigation tactics and practices the evidence indicates were utilized.

## B. Violation of discharge injunction

██ When a discharge is granted, the automatic stay is replaced by the permanent injunction of § 524, which enjoins creditors from attempting to collect from the debtor or from the debtor's assets any debts that have been discharged. *Watson v. Shandell (In re Watson),* 192 B.R. 739, 749 (9th Cir. BAP 1996), *aff'd,* 116 F.3d 488 (9th Cir.1997); *In re Venegas,* 257 B.R. 41, 44, 01.1 I.B.C.R. 5 (Bankr.D.Idaho 2001).

██ All prepetition debts that are not determined to be nondischargeable are discharged under § 727. *See* § 727(b).[36] The debtor and his assets are then protected by § 524 from any attempts to collect those discharged debts. The actual language of § 524(a) was quoted earlier in this Decision.

██ The purpose of the discharge injunction is to protect the debtor from having to put on a defense in an improvident state court action or otherwise suffer the costs, expense and burden of collection activity on discharged debts. *Levy v. Bank of the Orient (In re Levy),* 87 B.R. 107, 108 (Bankr.N.D.Cal.1988).

██ The § 524 injunction is an absolute defense and cannot be waived. *Pavelich v. McCormick, Barstow, Sheppard, Wayte & Carruth LLP (In re Pavelich),* 229 B.R. 777, 781–82 (9th Cir. BAP 1999). "Thus, all judgments purporting to establish personal liability of a debtor on a *discharged* debt, including judgments obtained after bankruptcy, are void to that extent. They are not voidable, they are void ab initio as a matter of federal statute." *Id.* at 782 (emphasis supplied).

---

**36.** Generally, that means all "scheduled" prepetition debts. *See* § 523(a)(3). However, there is an exception that applies in "no asset" chapter 7 cases. *See Venegas,* 257 B.R. at 46–47 (discussing *Beezley v. Cal. Land Title Co. (In re Beezley),* 994 F.2d 1433 (9th Cir. 1993)); *see also White v. Nielsen (In re Nielsen),* 383 F.3d 922, 925 (9th Cir.2004) (following *Beezley* and adopting the reasoning of its concurrence); *In re Frederick,* 99.4 I.B.C.R. 178 (Bankr.D.Idaho 1999). The underlying case here was a no asset, no claim bar date case, and these authorities thus apply. All prepetition debts owed by Amy and Clifford are therefore discharged unless (a) statutorily excluded, like tax debts, (b) a creditor establishes that the debt falls under some applicable provision of § 523 excluding it from the reach of the discharge, or (c) the debt is one excepted from discharge unless the debtor proves it should be discharged, such as student loans under § 523(a)(8).

▮ Parties who violate the discharge injunction may be liable under a theory of contempt. *Walls v. Wells Fargo Bank*, 276 F.3d 502, 510 (9th Cir.2002) (holding contempt is the exclusive remedy for violation of § 524, and that there is no "private right of action" for damages); *see also Richardson v. Runge Fin. Co. (In re Richardson)*, 03.4 I.B.C.R. 216, 219–20, 2003 WL 22670823 (Bankr.D.Idaho 2003) (noting no right to "damages" but a possible award of compensatory sanctions under the Court's contempt power); *In re Hawley*, 03.2 I.B.C.R. 108, 109 (Bankr.D.Idaho 2003) (citing *In Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1069 (9th Cir.2002)); *Venegas*, 257 B.R. at 47–48.[37]

▮ Prior to holding a party in contempt, the Court must identify the allegedly contumacious conduct and verify that it, indeed, transgressed § 524(a). In many ways, this requires determination of when the "claim" being pursued arose, since postpetition debts are unaffected by the discharge.

The Ninth Circuit has established that, for purposes of the bankruptcy discharge, a claim arises "at the time of the events giving rise to the claim." *O'Loghlin v. County of Orange*, 229 F.3d 871, 874 (9th Cir.2000); *accord Richardson*, 03.4 I.B.C.R. at 218–19 (collection of discharged and unreaffirmed prepetition debts violates § 524; award of attorneys fees for nature of post-petition litigation may be separate debt, not affected by discharge) (citing *Siegel v. Fed. Home Loan Mortgage Corp.*, 143 F.3d 525, 533 (9th Cir. 1998)) (holding that where discharged debtor sued on contract postpetition, the defendant's claim for contract attorneys' fees also arose postpetition); *see also Knutson v. Tredinnick (In re Tredinnick)*, 264 B.R. 573, 576 (9th Cir.BAP2001) (legal services performed postpetition gave rise to postpetition debt); *S.W. Marine Inc. v. Danzig*, 217 F.3d 1128, 1140 (9th Cir.2000) (debt arose from postconfirmation acts to compromise postpetition claims).

## 1. Contested conduct

Clifford's Motion outlines the conduct occurring after May 31, 2000 of which he complains. *See* Doc. No. 8 at 2. The acts include: (1) a November 7, 2002, application and affidavit for issuance of a writ of execution; (2) a request for admissions served in the state court action on December 2, 2002; and (3) a motion for entry of an order to show cause on September 1, 2003. *Id.*

### a. Writ of assistance

▮ The application and affidavit for a writ of assistance asserted that, under the "judgment" of February 16, 2000, a debt of $2,190.90 was owed by Clifford, and remained unpaid. Ex. 7. Though no specific request was made in the body of the pleading, a writ of execution was issued *ex parte* that same day. Ex. 8.

The $2,190.90 obligation in the Decree concerned the parties' prebankruptcy agreement to pay Kootenai County on a property tax obligation. Ex. 4 at 5. Based on the information provided to the Court, such a debt appears to have been nondis-

---

37. There are differences between using contempt to enforce the § 524(a) injunction and using § 362(h) to enforce the § 362(a) injunction. Under § 362(h), an award of actual damages is mandatory, while an award of compensatory sanctions is permissible in contempt enforcement of § 524. Additionally, punitive damages are authorized in appropriate circumstances under § 362(h), but are not available under the Court's contempt power. *Eskanos & Adler, P.C. v. Roman (In re Roman)*, 283 B.R. 1, 14 n. 11 (9th Cir. BAP 2002).

chargeable. *See* § 523(a)(1)(A) and § 507(a)(8)(B).

■ Clifford argues that the application and affidavit of November 7, 2002 "is a violation of the Discharge because it is an attempt to collect on a debt that was ordered in the *Decree of Divorce*, which was entered in violation of the automatic stay." Doc. No. 35 at 3. This confuses the discharge issue with that of the stay. It also misapplies § 524(a). The discharge injunction prevents collection of prepetition, discharged debts. The indebtedness being enforced by the writ was not subject to the discharge.

### b.  Request for admissions

The request for admissions served in December, 2002, asked *inter alia* that Clifford admit he had not paid certain "judgment" amounts under the Decree. These amounts matched the obligations related to Kootenai County, Robinson, and Robinson's parents. *See* Ex. 9 at 2–3; Ex. 4 at 4–5, 9. Clifford contends that "asking him to admit that he had not paid" these debts "was a violation of the discharge because it was an attempt to collect on debts that both Mr. Robinson and Mrs. Eastlick knew had been discharged[.]" *See* Doc. No. 35 at 3.

There are a number of problems with this contention. For example, it can be fairly questioned whether this discovery document was an "attempt to collect" at all.

Still, the record makes abundantly clear that Robinson knew the debts owed to him and his wife and to his parents were prepetition debts of Amy and Clifford. He also knew directly and intimately of the bankruptcy.[38] Whether the two debts were scheduled or not is of no consequence. *Nielsen,* 383 F.3d at 925; *Frederick,* 99.4 I.B.C.R. at 179. They were dischargeable debts and were, in fact, discharged.

■ Robinson acknowledged this at the time of the hearings herein, and admitted that enforcement of the Decree to the extent it included the discharged debts was improper and barred.

Robinson and his parents may not attempt to directly collect the prebankruptcy debts from either Amy or Clifford. Doing so would violate the discharge. Neither may they attempt to indirectly collect those obligations through the enforcement of Amy's postpetition divorce Decree.[39] Robinson has, as an officer of the Court, indicated that no further attempts to collect these discharged debts will occur. That satisfies the Court, and eliminates the need to enter any other or further injunctive prohibition under its contempt powers.[40] If an attempt to collect is made by Robinson, his wife, or his parents, this Court can again consider the matter and determine appropriate sanctions.

■ The conduct related to these debts occurred within the context of discovery that was voluminous and related primarily to postpetition and nondischargeable obli-

---

**38.** That Robinson's parents received notice of the bankruptcy (given the scheduling of the other, real property debt owed them) was not disputed. In any event, Robinson appears to have at all times acted as his parents' agent and had knowledge.

**39.** The sections of the Decree that attempt to impose liability on either Amy or Clifford for prepetition discharged and unreaffirmed debts, such as those owed to Robinson, to Robinson's parents, or the personal liability on the loan for the 1993 Subaru, are not enforceable without violating the discharge injunction.

**40.** Such an additional injunctive order would be superfluous in any event; there already exists an injunction under § 524(a).

gations under the Decree. Clifford has not identified specific damages incurred by reason of the offensive question about the discharged debts in the discovery.[41] The Court concludes that compensatory contempt sanctions are not warranted.

### c. Motion for order to show cause

▆ The September, 2003 motion for order to show cause was never introduced into evidence.[42] Testimony reflected that the motion concerned child support obligations that had not been paid and also Clifford's attempt to have the support modified.[43]

Questions of child support were entirely postpetition in nature, arising only upon divorce. Additionally, support obligations, had they been prepetition in nature, are excepted from discharge. *See* § 523(a)(5).[44] The injunction of § 524(a) is therefore not applicable. § 524(a)(3).

### d. Other litigation

▆ Clifford generally decries the overwhelming amount of discovery generated in the state court action. The volume and burdensome nature of Amy's discovery and attendant compulsion litigation was adequately established by the testimony of Clifford's attorneys and the documents of record. *See, e.g.,* Exs. 10, 11, 12. Even granting some credence to Amy's

rejoinder that (a) Clifford had not paid support and related expenses for the children, and (b) Clifford had made inconsistent statements or representations, the record reflects that Robinson, in effect if not by design, swamped Clifford and his counsel with discovery.

Still, this conduct does not raise a question of violation of discharge. The propriety of behavior—of either party, or either party's lawyers—in the state court litigation is a question for the state court. *Accord, Richardson,* 03.4 I.B.C.R. at 218–19. That court not only has direct knowledge about the case, the litigants, and the attorneys, but it can address these sorts of matters, including any financial consequences, in connection or conjunction with resolving other state law issues between the parties.

### CONCLUSION

All these matters were presented to the Court at great length and with concomitant cost. But the issues, at bottom, are discrete. They are uniquely federal, and concern the existence and operation, and modification or enforcement, of the injunctions of § 362(a) and § 524(a).[45]

Upon the foregoing findings of fact and conclusions of law, the Court determines that the automatic stay shall be annulled. Doing so resolves the issue of the void

---

41. Given the volume of discovery in the state court action, the aspects involving the discharged Robinson family debts amount to a drop in a large bucket.

42. The Court's notes and records reflect that the motion was marked as Exhibit 16 but was never admitted. Clifford's October, 2003 response, raising bankruptcy defenses as well as others, was marked as Exhibit 17 and also was not admitted. The nature of these 2003 pleadings and litigation was addressed to some degree by testimony. The matters were also referenced in the initial Motion. *See* Doc. No. 8 at 5–6, and at Ex. I, J.

43. There was also an "intervention" of the State of Idaho on the support matters that was at issue.

44. The special treatment of support obligations is also recognized by the exception to the automatic stay found in § 362(b)(2)(A)(ii) and (b)(2)(B).

45. *See Richardson,* 03.4 I.B.C.R. at 218 (discussing *McGhan v. Rutz (In re McGhan),* 288 F.3d 1172 (9th Cir.2002)). *See also Gruntz v. County of Los Angeles (In re Gruntz),* 202 F.3d 1074 (9th Cir.2000) (*en banc*).

nature of the Decree and other orders of the state court. It also renders moot arguments of the violation of stay and § 362(h) consequences therefrom. The Court further determines that no violation of discharge injunction occurred requiring imposition of sanctions under the Court's contempt authority.

An order will be entered accordingly.